**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**AT FRANKFORT**
**CIVIL ACTION NO. 05-66-KKC**

**BILLY STEWART JEFFRIES,**                                        **PETITIONER**

**V.**

**JAMES L. MORGAN, Warden**                                  **RESPONDENT**

**SUPPLEMENTAL REPORT & RECOMMENDATION**

On April 11, 2006, the undersigned previously recommended denial of petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. §2254. Though adopted by the presiding district judge, judgment was reversed by the Sixth Circuit Court of Appeals and remanded to this court for further review by mandate filed on May 28, 2008.

Following remand, new counsel appeared on behalf of the respondent, and the presiding district judge held a status conference on July 10, 2008. Thereafter, on July 14, 2008 the court entered a scheduling order that provided for the filing of additional state court transcripts and supplemental briefing. In accordance with that order, petitioner filed a supplemental memorandum on October 31, 2008, and respondent filed a responsive memorandum on December 23, 2008. Petitioner filed a reply on January 8, 2009. Pursuant to local practice, the matter has been referred to the undersigned magistrate judge a second time for a supplemental report and recommendation following remand. *See* 28 U.S.C. §636(b). I have provided a Table of Contents due to the unusual length of this supplemental R&R.

1

# Table of Contents

I. Factual and Procedural Background...................................................................3
   A.  Sixth Circuit Summary of Proceedings.......................................................3
   B.  Mandate on Remand...................................................................................8

II. Analysis..........................................................................................................9
   A.  Standard of Review for Claims Presented...................................................9
   B.  Sufficiency of the Evidence Claim.............................................................10
       1.  Lack of Procedural Default....................................................................11
       2.  Merits of Challenge Under *Jackson*......................................................12
           a.  Defense Theories of the Evidence........................................12
           b.  The Kentucky Court's Rejection of Sufficiency Claim.........15
           c.  Petitioner's Challenges to State Court's Conclusions............16
                i.  The Laundered Clothing and Blood...........................17
                ii.  A Clean Palm and Muddy Fingers............................21
                iii.  Fiber and Hair Evidence...........................................22
                iv.  The Short Time Frame.............................................24
                v.  Defendant's Physical Abilities...................................27
                vi.  Alleged Police Rush to Judgment.............................28
                vii.  Considering All the Evidence...................................29
   C.  Brady Claim.............................................................................................36
       1.  Kentucky Courts' Rejection of *Brady* Claim.....................................37
       2.  Error of Fact Re Disclosure of Dillon Name.....................................43
       3.  Petitioner's Claims of Legal Error.....................................................48
           a.  Whether "Favorable" Information Was Suppressed..............49
           b.  Information Not Material or Prejudicial...............................53
           c.  Record Evidence Contrary to *Brady* Claim.........................58
   D.  Non-Constitutional Claims/Implied Innocence............................................59
       1.  Errors of State Law Not Grounds for Relief.......................................60
       2.  Failure to Develop State Court Record...............................................61
       3.  Inadequate Proof of Actual Innocence................................................64

III.  Conclusion and Recommendation......................................................................65

## I.  Factual and Procedural Background

Due to the number of proceedings involved, the history of this case is relatively lengthy. At its heart, it involves the trial and conviction of a young defendant - 15 and intoxicated at the time of the offenses some 14 years ago - for brutal crimes - the attempted rape and horrific murder of a 77 year old widow.  The essence of his defense at trial and in post-conviction proceedings has been that, while briefly present at the scene of the murder, he was simply in the wrong place at the wrong time, and that another more recently identified suspect may have been the true perpetrator.  The history has been summarized repeatedly by both state and federal courts both on direct appeal and in post-conviction proceedings.

### A.  Sixth Circuit Summary of Proceedings

Because the Sixth Circuit's summary is the most recent, it will be used in this supplemental R&R

#### 1.  Trial and Direct Appeal

The Kentucky Supreme Court summarized the evidence presented at trial as follows:

> On February 20, 1995, Mary McKee left her house for a  walk and never returned.  The next day, her housekeeper became alarmed when Mrs. McKee failed to answer her door.  The housekeeper contacted a neighbor.  A search was conducted and Mrs. McKee's body was discovered in a yard between two houses. Her pantyhose and panties had been removed, her longish skirt was hiked up to her mid-thigh, and her blouse was ripped partially open.  Blood was splattered on a nearby wall and teeth fragments were scattered near the body.  There were smeared fingerprints on Mrs. McKee's right thigh and buttocks.  According to the medical examiner, Mrs. McKee was beaten to death, apparently with the bloody rocks found near her body.  Further, the medical examiner testified that Mrs. McKee did not die immediately from the beating but probably expired some twenty minutes thereafter.

> On February 27, 1995, Jeffries was questioned by the police about Mrs. McKee's murder and turned over the clothes he was wearing on the day of the murder.  Tests revealed the presence of blood on his jacket, sole of his shoe, and

3

inside the tongue of his right shoe.[1]  There was no identification as to whom the
blood on his jacket and the sole of his shoe belonged or whether it was even
human blood.  However, the blood found on the inside of the tongue of Jeffries'
shoe was positively identified as Mrs. McKee's.  Further, a palm print on Mrs.
McKee's glasses, which were found next to her body, was positively identified as
belonging to Jeffries.  Finally, witnesses testified that they saw Jeffries in the
general area where Mrs. McKee's body was found.

Upon questioning, Jeffries denied all knowledge of the crime.  However,
when he took the stand, he testified that he had lied to the police when they
questioned him. Contrary to his earlier statements, he testified that on the evening
of the murder he had been cutting through the yard in question and had tripped
over a body.  He testified that he could not even identify the gender of the body.
He ran away because he was scared.  He never checked on the well-being of the
person he tripped over.  He did not tell his mother or his father about tripping
over the body, apparently because his parents were mad at him and telling them
would require a confession that he had been drinking that day.

Doc. 22, *Jeffries v. Morgan*, 522 F.3d 640, 641 (6th Cir. 2008), *see also* Memorandum In Support

of Petition, Doc 2, Exh. 2 (hereinafter Doc. 2-2).[2]

The Sixth Circuit further summarized trial and post-trial proceedings relevant to

petitioner's current claims:

Also introduced at trial were the results of a forensic examination, which
discovered a hair matching neither Jeffries nor McKee inside her underpants[3] and
fibers on the body that did not come from either McKee's or Jeffries' clothes.  On
March 21, 1997, the jury convicted Jeffries based on this evidence.  On June 9,
1997, Jeffries was sentenced to thirty-five years in prison.

On direct appeal, Jeffries argued that the evidence was insufficient to
support his conviction.  On October 15, 1998, the Kentucky Supreme Court, in an

---

[1]The trial record reflects that the blood was on the tongue of the left shoe.

[2]This court refers to pagination as it appears in the CM/ECF record of this court, rather
than using the pagination of the state court record or Appendix.  For example in this court's
record the hypertext that denotes Document 7, Exhibit 6 at page 66 is referred to as Doc. 7-6 at
66, even though it also bears the page numbers of 42 and 213 from state court proceedings.

[3]As discussed below, the trial record reflects that the unidentified hair was not "inside her
underpants" but instead discovered on pantyhose that had been removed from the victim's body.

unpublished opinion, rejected this argument and affirmed his conviction. With respect to the attempted rape charge, the court held:

> The overt acts in this case are those that led to the discovery of Mrs. McKee on her back with her undergarments removed, her skirt pushed up, her blouse torn partially open, and with smeared fingerprints on her thigh and buttocks. The circumstances of the case are that the brutal attack on Mrs. McKee occurred in a yard away from the street, out of sight.

Concerning the issue of the identity of the killer, the court cited the blood found on Jeffries' clothes, especially the drop matching McKee's blood on the tongue of his shoe, Jeffries' palm print on her glasses, witness testimony placing him near the crime scene and stating that he was mud-covered, evidence that his clothes had been laundered, and the inconsistency between Jeffries' testimony at trial and his statement to police as evidence of Jeffries' guilt.

## 2. Information Discovered After Trial

In March 1998, Jeffries' counsel received a letter from the Kentucky Attorney General listing the results of an investigation into various third-party statements that John Dillon had admitted his involvement in McKee's murder, including the following: (1) on June 10, 1997, the day after the sentencing, Chris Beach, at the time a prisoner in jail, told a police detective that he had in the past heard Joe Buck Dixon refer to Dillon as a rapist and that he, Tyrus Beach, and Annette Clark heard Dillon tell a girl named Tammy: "The old lady kept screaming. When he got done I was going to take my turn. She kept screaming. I had to kill the old bitch."; (2) on or about June 12, 1997, Linda Raisor told a detective that Pocahontas Biggers (Dillon's aunt) had told her three months ago that Dillon had admitted murdering McKee; (3) on June 24, 1997, Tiffany Solace told a sheriff's deputy that Dillon killed McKee, but provided no basis for her belief; and (4) on January 22, 1998, Tammy and Kim Chesser told a person in a judge's office that Dillon had threatened Nikki Chesser in connection with the case. None of these statements were known to the Commonwealth before Jeffries' trial.

On June 9, 1998, in response to this letter, Jeffries moved for a new trial in the trial court based on newly discovered evidence. He attached two affidavits to his motion: (1) Nikki Chesser's affidavit stating that Dillon admitted killing McKee and threatened Chesser not to tell anyone about it; and (2) Beach's affidavit that he overheard Dillon publicly declare his involvement in a killing, stating "I don't remember if he said I did not mean to kill her or we did not mean to kill her. But after that he was real scared and crying."

5

A detective Pratt interviewed Dillon after Jeffries' trial concerning these allegations. During this interview, Dillon stated that he was with a girlfriend at the time of the killings.[4] Pratt testified at a hearing on the motion for a new trial that Dillon told him the girlfriend's name was Jessica Peyton. Peyton testified before a grand jury that she was 11 years old at the time of McKee's murder, did not live in the county where the murder occurred at the time of the offense, was never romantically involved with Dillon, and was not with him at the time of the offense.

Jeffries presented two legal theories concerning why this new evidence warranted a new trial. First, he argued that the evidence discovered and disclosed by the Commonwealth after trial and evidence that the defense might discover after additional investigation made it reasonably certain that a new trial would have a different result. Second, he argued, based on counsel's understanding at that time that the Commonwealth knew that third parties had heard Dillon claim responsibility for the killing before trial, that the Commonwealth had failed to turn over exculpatory evidence to Jeffries in violation of his rights under *Brady*. During discovery on this motion, the situation was clarified: the Commonwealth had not known before the trial about the third-party accounts of Dillon's statements, but it had failed to turn over some information about Dillon that it did possess before trial.

The Commonwealth had briefly investigated Dillon soon after the murder. A probation officer had spotted Dillon with a white teenager (not Jeffries) 7/10ths of a mile from where the body was found about half an hour before the crime was committed. Detective Rick Barbiarz[5] interviewed Dillon, who claimed that he was with his girlfriend at the time of the killing. There is no record that anyone ever checked on Dillon's alibi. Based on Dillon's statements and the statement of his grandmother that she was keeping Dillon on a "tight leash," Barbiarz cleared Dillon as a suspect. In the motion hearing, Babiarz [sic] testified that he did not consider Dillon a suspect and that he was not sure if the interview had been taped.

Before the trial, Jeffries' counsel requested a list of all individuals the police questioned during the investigation, including all related notes and recordings. In its response to this request, the Commonwealth failed to include the information about Dillon in the list of suspects it had cleared. Jeffries thus

---

[4]As discussed below, petitioner attributes this statement to Dillon without significant evidentiary support. The state courts made no specific factual finding on whether Dillon claimed to have visited Peyton on the day of the murder.

[5]An affidavit in the trial record from the detective himself spells his surname as "Babiarz." Doc.7-9 at 39.

modified the theory of his *Brady* claim, arguing that the information the Commonwealth had about Dillon pretrial was exculpatory, because it would have led the defense to discovery of the witnesses to Dillon's statements admitting to the murder and weaknesses in Dillon's alibi, all of which would have strengthened Jeffries' defense that he had stumbled across the body after the killing. The trial court denied the motion for a new trial, and on October 17, 2003, the Kentucky Court of Appeals affirmed. In addressing the *Brady* claim, the court stated that

> If the exculpatory evidence was available to the prosecution before the trial, we would have no reluctance in reversing and remanding for a new trial... What we have in the current situation is the suppression of the name and interview of a suspect before trial. Neither the name nor the results of the interview are in themselves exculpatory. This case is similar to *Wood v. Bartholomew*, wherein the Supreme Court quoted (with approval) the Federal District Court's analysis of the suppressed evidence as being not exculpatory evidence but "*[t]he information withheld only possibly could have led to some admissible evidence." Wood*, 516 U.S. [1,] 5 [(1995)] (emphasis in original).

### B. Procedural History

On September 19, 2005, Jeffries filed his petition for a writ of habeas corpus, raising two grounds: (1) the prosecutor's failure to turn over the name and alibi of a person interviewed during the investigation violated his rights under *Brady*, and (2) the evidence introduced at trial was insufficient to support a conviction.

On November 22, 2005, the Commonwealth moved to dismiss the petition as procedurally defaulted and on the merits. The Commonwealth included the written state trial record; this record did not include the transcript of the trial.

On December 22, 2005, Jeffries moved to compel production of the state trial court record. The court submitted this motion to a magistrate judge for review. On February 3, 2006, the magistrate judge ordered the Commonwealth to produce a list of all available transcripts and portions of the trial for which only video, not transcripts, were available.

On March 20, 2006, Jeffries moved for leave to expand the state court record. On April 11, 2006, the magistrate judge issued a report and recommendation denying Jeffries' grounds for habeas relief on the merits and dismissing his motion to expand the record as moot.

On May 30, 2006, Jeffries filed an application for certificate of appealability for the district court's denial of his Brady claim, his sufficiency of the evidence claim, and his motion to expand the record.

*Jeffries*, 522 F.3d at 641-644.  Jeffries also included in his application for certificate of appealability a challenge to this court's conclusion that Jeffries' failure to call Dillon as a witness at the hearing on his motion for new trial in state court was a "failure to fully develop the factual basis for his claim in state court."  Finally, Jeffries included a challenge to this court's finding that evidence contradicting Dillon's alibi was "not well developed."  Doc. 20.  The Sixth Circuit granted appeal on all asserted claims.  *Id.,* 522 F.3d at 644.

**B.  Mandate On Remand**

Despite expanding the certificate of appealability to all asserted claims, the Sixth Circuit ultimately reviewed only one: this court's denial of petitioner's motion to expand the record in this habeas proceeding to include additional portions of the state court record.

[A] constitutional sufficiency of the evidence challenge requires a careful review of the entire trial transcript by the habeas court when a petitioner disagrees with the challenged state court opinion's summary of trial testimony or relevant facts. . ..

We find that both Jeffries' constitutional challenge to the sufficiency of the evidence and his *Brady* challenge require a habeas court to review the entire record of the trial in order to properly assess his habeas petition.  While the state court opinions provide a summary of the facts, Jeffries "quarrel[s] with that summary."  *Clark [v. Waller,* 490 F.3d 551 (6th Cir. 2007)] at 556.  He argues that, on direct appeal, the Kentucky Supreme Court did not give "a complete picture of the trial," and he cites evidence, such as the hair and fibers that matched neither Jeffries nor McKee, that "may be in the trial transcript but simply was not discussed in the state court's opinion[s]," ....

Having found that the district court committed reversible error by not reviewing the entire trial record during its review of Jeffries' habeas petition, we need not reach the other issues raised on appeal.

*Id.* at 645.

## II.  Analysis

### A.  Standard of Review For Claims Presented

The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to all

habeas corpus cases and requires "heightened respect" for legal and factual determinations made

by state courts.  *See Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  Relief may be

granted on a federal constitutional claim decided by a state court only if the state court decision

is "contrary to, or involved an unreasonable application of clearly established federal law, as

determined by the Supreme Court of the United States." *Williams v. Taylor*, 529 U.S. 362, 405

(2000).

All findings of fact by the state court are presumed to be correct and only "clear and

convincing evidence" may alter those determinations.  *Mitchell v. Mason*, 325 F.3d 732, 737-738

(6th Cir. 2003), *cert. denied* 543 U.S. 1080 (2005); 28 U.S.C. § 2254 (e)(1).  Legal conclusions

made by state courts are also given substantial deference under the AEDPA.  Section 2254 (d)

provides:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

As the Supreme Court has reiterated:  "A state-court decision is contrary to this Court's clearly

established precedents if it applies a rule that contradicts the governing law set forth in our cases,

or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result." *Brown v. Payton*, 125 S.Ct. 1432, 1438 (2005); *see also Williams v. Taylor*, 529 U.S. at 405-406.

When factual and legal issues are so strongly contested, as they are in this case, the statutory limitations on the scope of review become paramount.  It is not for this court to decide the petitioner's guilt or innocence as the Kentucky jury was called to do some 12 years ago, or whether another assailant walked free, so long as the state courts' post-conviction decisions did not result in a decision contrary to clearly established Supreme Court law and were not based upon an unreasonable determination of the facts.   In the instant petition for writ of habeas corpus, petitioner presents two claims: 1) the state courts committed factual and legal errors in rejecting his constitutional challenge to the sufficiency of the evidence at trial; and 2) the state courts committed legal error in rejecting his claim concerning evidence pertaining to John Dillon.  Underlying petitioner's claims is a suggestion of innocence, although Jeffries does not argue actual innocence before this tribunal.[6]

## B.  Sufficiency of the Evidence Claim

Petitioner first argues that the Kentucky Supreme Court's decision rejecting his challenge to the sufficiency of the evidence was contrary to or involved an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979) and related Supreme Court precedents.  Petitioner's *Jackson* argument alleges error in the state court's *legal* conclusion, but petitioner also strenuously argues the underlying facts of this case.  He contends that the jury erred at trial and

_____

[6]Counsel does describe Jeffries as someone "who has maintained his innocence throughout." Doc. 2 at 21.

10

the appellate courts erred in affirming his conviction because the conviction amounts to an unreasonable determination of the facts.   Petitioner's challenge to the constitutional sufficiency of the evidence against him, by its nature, limits review to the evidence presented at trial.   In other words, petitioner presents no argument related to and this court does not review the post-trial evidence of Dillon's involvement in regard to this first claim.  *See Herrera v. Collins,* 506 U.S. 390, 402, 113 S.Ct. 853 (1993)(review of sufficiency claim limited to record evidence).

### 1.  Lack of Procedural Default

The respondent previously argued that petitioner had procedurally defaulted his constitutional sufficiency of evidence claim through his failure to cite to *Jackson v. Virginia* or other federal law on direct appeal in state court.   On remand to this court, the respondent reiterates this same argument, that the sufficiency of evidence claim is procedurally foreclosed from federal review in this habeas corpus proceeding.

The petitioner contends that the Commonwealth should not be permitted to relitigate this issue since it filed no objections to the April 2006 R&R, which concluded that petitioner had not procedurally defaulted his constitutional sufficiency of evidence claim.   The Commonwealth failed to appeal the district court's adoption of that analysis.

I agree with petitioner that the Commonwealth's failure to challenge this court's prior analysis bars further challenge under the law of the case doctrine.  *See e.g. JGR, Inc. v. Thomasville Furniture Indus, Inc.,* 550 F.3d 529 (6th Cir. 2008)(a party that fails to appeal waives his right to raise the issue before the district court on remand).   In the alternative, I find no basis for departure from my prior analysis, which I hereby incorporate without fully repeating.  Suffice it to say that petitioner fully and fairly presented the claim to the state courts

11

through his reliance upon state cases employing federal constitutional analysis, and by stating the claim in such a plain fashion - as insufficient evidence - as to not substantially differ from the federal claim presented here.  *See Clinkscale v. Carter,* 375 F.3d 430, 437 (6th Cir. 2004), *cert. denied*, 543 U.S. 1177 (2005) (*citing Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2004)).

### 2.  Merits of Challenge Under *Jackson*

Although the claim has not been procedurally defaulted, I previously concluded that petitioner's challenge to the sufficiency of the evidence does not warrant relief under §2254 because the state court's decision is neither contrary to nor an unreasonable application of clearly established federal law, nor based on an unreasonable determination of facts.  Having now had the benefit of review of the entire state court trial transcript, I confirm my original analysis.

### a.  Defense Theories of the Evidence

The Commonwealth's case was built on circumstantial evidence as well as some forensic evidence (blood and palm print) linking the defendant to the victim.  Petitioner argued at trial, on appeal, and claims again in this post-conviction proceeding that the evidence presented was constitutionally deficient to support his convictions.  Although the constitutional *Jackson* standard requires this court to consider the evidence **as a whole** in a light favorable to the prosecution, I begin by summarizing the evidence that petitioner contends was either ignored or insufficiently considered by the Kentucky courts.

Three related defenses were offered at trial: 1) the forensic evidence could not be trusted and/or the police wrongly pursued only the defendant; 2) to the extent that forensic evidence tied the defendant to the scene, it was because he had stumbled over the body; and 3) there was not enough time for the defendant to have committed the alleged crimes based upon where he was

12

seen in the minutes before and after the murder.  The trial transcript reflects that defense counsel also pursued an alternative strategic defense by emphasizing evidence that the defendant was so intoxicated as to be incapable of forming the requisite criminal intent.  Defense counsel successfully proffered jury instructions on lesser offenses as well as on the level of voluntary intoxication required for acquittal.

With respect to the first strategy, the defense attacked the forensic evidence on several grounds.  Counsel suggested through cross-examination that the palm print may have gotten on the glasses at a time not connected with the murder (though only the "stumbled and fell" explanation was offered) and contrasted the clean palm print with unidentified muddy prints found on the body.  The defendant brought out evidence at trial that some of the blood evidence was either inconclusive (because it could not be identified as the victim's) and repeatedly questioned the chain of evidence.  The defense also pointed out forensic evidence collected but not tested by the prosecution, delays in testing some evidence, and specific hair and fibers that could not be traced to the defendant or the victim.  The defense reasoned that the small amount of forensic evidence that did link the defendant to the victim (assuming it did) was more consistent with the defendant's stumbling over the body just minutes after the murder, because otherwise more blood and other forensic evidence would have been found.  Finally, plaintiff pointed to evidence that police did not seriously investigate other suspects and evidence that he would have had to commit the offense during an extremely short time frame based on witness accounts.

Before this federal court petitioner continues to argue that circumstantial evidence so strongly points to another perpetrator, that no reasonable jury could have concluded that it was

Billy Jeffries and not an unknown other person who committed the crimes.  He argues that affirming the convictions required adoption of the "least probable theory."  Beginning at trial and to this day, Jeffries has argued that the explanation that defendant merely stumbled across the body most plausibly accounts for all the evidence.  In closing argument at trial, counsel theorized that something drew the victim's attention between the houses while she was walking, with the defendant simply nearby.  Then, the true perpetrator - not the defendant - picked up the victim and carried her down a slope[7] to the sideyard, struggling and fighting.  Once at the bottom of that slope, the assailant hit the victim in the head.  Meanwhile, the defendant was beginning to walk up through the same yard where the assault was simultaneously occurring.

> And the killer begins to do just exactly what they say the killer did in this case. And that is to peel off her panties and her pantyhose.  He's in a secluded spot. Nobody has heard the fight at this point in time.  He has complete and total control of the situation.
>
> Except what happens as he bends down?  He hears a drunken, stumbling Billy Jeffries coming back up through the yard, and he hides.  And Billy Jeffries comes through and trips over the body, just like he said, falls down, leaving his finger - leaving his palm print on the glasses on the ground, just like he said, sees it and runs away.

TR 7-97 to 7-98.  Jeffries focused on the alleged inadequacies of the police investigation and argued that most of the evidence (the unrelated hair and fiber, lack of mud on the palm print, the defendant's being outweighed by the victim) was inconsistent with guilt.  "If you vote to convict Billy Jeffries, you've got to understand and be able to explain to yourself why all this evidence points the other way." TR 7-100.

---

[7]Trial testimony indicated a slope of approximately 4 and a half feet.  Transcript Vol.3, page 56 (hereinafter TR 3-56).  The trial transcript has not been scanned into this court's electronic record.

14

### b.   The Kentucky Court's Rejection of Sufficiency of the Evidence Claim

As discussed, 28 U.S.C. §2254 generally requires deference to the decision of the state courts, absent significant legal or factual error.  The trial court rejected Jeffries' motion for directed verdict and the Kentucky Supreme Court rejected his challenge to the sufficiency of the evidence on direct appeal, holding that it was not clearly unreasonable for a jury to find Jeffries guilty of either count.  Doc.2-2 at 5.

In rejecting Jeffries' challenges to the evidence, the Kentucky court first evaluated the evidence on the attempted rape charge, since Jeffries specifically pointed to the absence of forensic evidence.   The court rejected Jeffries' hypothesis that the evidence was insufficient to prove guilt on the charge:

> The overt acts in this case are those that led to the discovery of Mrs. McKee on her back with her undergarments removed, her skirt pushed up, her blouse torn partially open, and with smeared fingerprints on her thigh and buttocks.  The circumstances of the case are that the brutal attack on Mrs. McKee occurred in a yard away from the street, out of sight.

Having reviewed the entirety of the trial transcript, I agree with the state court that it was not clearly unreasonable for the jury to conclude that an attempted rape had occurred.  In addition to the circumstantial evidence that the crime had occurred, the Commonwealth explained the absence of vaginal trauma or semen through testimony that the elderly victim's genitalia were atrophied such that penetration would have been impossible.

Of course, Jeffries also argued on direct appeal that it was unreasonable for the jury to conclude that *petitioner* was the perpetrator rather than an unidentified person.  Again, the Kentucky Supreme Court held otherwise based on the following analysis of evidence:

> The evidence against Jeffries consisted of: blood on the tongue of one of his shoes

that was positively identified as being Mrs. McKee's blood; a palm print on Mrs. McKee's glasses which was positively identified as belonging to Jeffries; witness testimony placing him near the place where Mrs. McKee's body was found within the time frame in which the murder occurred; and evidence that there was traces of unidentified blood on the jacket and shoes he wore on the day Mrs. McKee was murdered. While circumstantial, based on this evidence, it was not clearly unreasonable for the jury to find Jeffries guilty of murder.

Doc. 2-2. The Kentucky Supreme Court also noted evidence that Jeffries was covered with mud on the day of the murder, but that the clothes he later surrendered to police were free of mud, blood, and dirt and appeared to have been laundered.

Regarding evidence that the defendant alleged pointed to another perpetrator, the Kentucky Supreme Court held:

Jeffries' arguments on appeal that there was physical evidence pointing to another perpetrator of the crimes and that the crimes could not have been committed during the time line presented by the Commonwealth go to the weight and credibility of the evidence and not its sufficiency. Thus, these arguments have no bearing on the *Benham* standard.

*Id.* at 6. Finally, the Kentucky Supreme Court found there was no abuse of discretion in admitting evidence of unidentified blood under state evidentiary rules, and that it was not error for the prosecutor to argue that Jeffries' clothes had been washed as a "reasonable" inference in light of the evidence presented. *Id.* at 7-9.

### c. Petitioner's Challenges to State Court's Conclusions

Having reviewed the evidence on which petitioner relies and the Kentucky courts' rejection of his sufficiency claim, I turn now to the crux of petitioner's argument and the Sixth Circuit's instructions on remand. Did the Kentucky court correctly apply *Jackson* in view of the evidence presented at trial as a whole? I answer this question affirmatively, bearing in mind the standards of 28 U.S.C. §2254. Petitioner has failed to show either legal or factual error sufficient

16

to support a grant of the writ. Because petitioner's challenge to the state court's decision intertwines factual and legal error under *Jackson* by arguing that the state court ignored or insufficiently considered specific pieces of evidence and mischaracterized the trial record, my review sequentially addresses those same items of evidence within the context of the entire trial record.

### i. The Laundered Clothing and Blood

Petitioner presented several arguments on direct appeal to the Kentucky Supreme Court that related to the paucity of blood evidence and circumstantial evidence that he had washed that evidence away. He alleged evidentiary error, arguing that "the question of whether washing clothes can remove blood stains to the point where blood can no longer be detected through forensic tests is outside of the range of common experience and observation," requiring expert testimony. The Kentucky Supreme Court rejected that argument, noting that the defendant offered "no authority to support this premise," and that "[i]ntuitively, the contrary would appear to be the case." Doc.7-7 at 8-9. The Kentucky court also found no error in the prosecution's argument that the clothes had been laundered.

Petitioner continues to challenge the Kentucky Supreme Court's reference to the defendant's clothes having been laundered, asserting that such a finding is not supported by the record. I disagree. Petitioner has failed to show that this finding of fact is erroneous. Although there was no *direct* testimony that the defendant's clothing had been laundered, there was ample indirect testimony as well as the introduction of the clothing itself that supports both the state court's finding and presumed conclusion of the jury.

First, witness Beth Gibbs testified that the petitioner had gotten muddy earlier in the day,

including mud on his pants; witness Ben Mills also testified that he got muddy, and the defendant testified that he fell "a couple of times" on a hill near a creek.  TR 4-12, 4-30; 4-58; 6-74.  The investigating detective did not collect the clothing from the defendant until a week after the murder, and did not notice any mud or substance on the pants given to him.  TR 5-102.  All of the items of the defendant's clothing were used as exhibits and admitted into evidence, so the jury could readily observe whether they were free of mud.  The Kentucky Supreme Court held that expert testimony on the issue was not required where it was "within the range of common experience and observation." Doc.2-2 at 8.  And though this court does not have the jeans to examine, the prosecutor referred to their condition in closing as having been washed "looking like they could be off the shelf at the department store," specifically calling the jury's attention to the absence of visible mud or blood on them.   TR 7-139.

Expert testimony added indirect evidence of laundering.  A forensic expert testified that foreign fibers (fibers not native to the object being examined) are transferred commonly and easily, but that washing clothing can cause the loss of any foreign fibers that may have been transferred.  TR 3-230.  She testified that despite the fact that some hair was recovered, no foreign fibers were collected from the defendant's blue jacket, the turtleneck, his tennis shoes, or his jeans.  TR 3-227 to 3-228.  Finally, additional inferential evidence of laundering was provided through the testimony of forensic expert Pat Hankla, who testified that only "trace" amounts of blood were found on the defendant's jacket and shoes, as well as to the absence of blood on the defendant's jeans and shirt.  The blood on the jacket was not visible until chemicals

18

were applied to make it visible.[8]  TR 5-190.

Finally, testimony from the defendant and his father was consistent with the clothes having been laundered.  The defendant's father testified that when he picked up the defendant shortly before 6 pm the evening of the murder, that the defendant went in the house, changed his clothes, and took a shower.  TR 6-32.  He testified that he did not know whether or not any of the items of clothing had been washed between February 20, 1995 and February 27 when the police collected the defendant's clothing.  However, he also testified that his wife "would probably be the one had to done the laundry" assuming it had been done.  TR 6-31.  The defendant's mother was not called to testify.

The defendant himself testified that he could not recall whether or not his clothing had been washed.  "I'm not saying that they wasn't washed, I mean."  TR 6-88.  The location and amount of the microscopic amount of blood found on the defendant's shoes (inner tongue of left shoe, in between treads of right shoe) and jacket (three spots containing trace amounts too small to identify) and the absence of blood elsewhere on his clothing is consistent with the items having been washed even if the jury had believed the defendant's explanation.

Alternatively, petitioner argues that a finding that the clothes had been laundered is consistent with innocence, to the extent that they were "treated no differently than the muddy pants of 15 year old boys nationwide- by being put into the family laundry."  Doc.37 at 2.  The

_____

[8]Petitioner continues to argue that the jacket "was the sort which generally requires professional cleaning."  Doc.37 at 3.  However, there was no testimony that the jacket required professional cleaning, and the state courts overruled petitioner's objection at trial as well as his argument on appeal concerning this factual issue. I find no basis which requires this court to reject the reasoning of the state courts and accept petitioner's hypothesis that the jacket could not have been cleaned by petitioner.

19

weight to be given to evidence that the clothes had been laundered was within the purview of the jury.  To the extent that the jury drew an inference consistent with Jeffries' guilt, that inference is one this court must also draw under *Jackson*'s requirement that evidence be considered in a light "favorable to the prosecution."

Building upon his laundered clothing argument, Jeffries argues that the small quantity of blood evidence linking him to the crime scene was also more consistent with innocence. The crime was bloody and violent, but only trace amounts of blood were found on Jeffries' clothing. According to Jeffries, such minute amounts of blood evidence more reasonably support the defense theory that he stumbled upon the body and should not be viewed as supportive of a finding of guilt.

As discussed, evidence that the clothing had been laundered plausibly explains the relative lack of blood evidence on the clothing of Billy Jeffries, a conclusion affirmed by the state courts.  In addition, the victim's blood spattered on a nearby retaining wall was consistent with a rock being used against the side of her face, as testified to by the coroner; there was no testimony that the blood *necessarily* would have spattered onto Jeffries in a such quantity that it could not have been washed out.

The blood evidence introduced at trial supported the convictions.  In addition to the incontrovertible DNA evidence on the inner tongue of defendant's left shoe, additional blood evidence was found on the defendant.  There was human blood on the defendant's right shoe, though of too small a quantity to be tested.  There was blood in three different spots on the jacket, even though again the spots were too small in quantity for DNA testing or even to

20

identify positively as human blood.[9]

Before the jury, the defense introduced evidence that the blood could have come from others.  Two people cut themselves at the party earlier in the day.  Billy Jeffries testified that he helped one of them bandage herself, though he could not remember details.  TR 6-63.  Of course, the positive DNA identification of the victim's blood could be explained only if the jury credited his testimony that he stumbled over the body.   Under *Jackson*, this court is not required to construe the blood evidence in favor of the Jeffries' alternative theory when the evidence was as easily and reasonably construed by the jury as supporting the prosecution's theory.

### ii.  A Clean Palm and Muddy Fingers

The defendant next argues that his clean palm print on the glasses, which were folded neatly next to the body, is inconsistent with guilt (and more consistent with his tripping over the body) in view of the muddy prints found on the body itself.  Again, I disagree.   The defendant did not testify directly about the glasses but the jury was left to believe that his palm print must have been transferred to the lens when he tripped over the body and fell - presumably on the glasses.  Yet the glasses were not mangled or misshapen, but were folded neatly, free of dirt or debris, lens side up and resting neatly next to the body.  The jury may well have been skeptical of the defendant's explanation of having fallen on the glasses given their condition.

Moreover, the jury could easily have determined that the state of the glasses were more consistent with the defendant having left a clean *right-handed palm* print, with the very same defendant having left muddy prints from the dirty *fingers* of his *left* hand.  Experts testified that the muddy fingerprints discovered on the victim's body could not be "lifted" from the body or

---

[9]The defense vigorously opposed the admissibility of this evidence, but was overruled.

otherwise identified due to forensic limitations; there is no question that they may have been the defendant's. The coroner testified that the muddy prints appeared to have been made by fingertips or fingerpads of the perpetrator's *left* hand, *see* TR 4-153, whereas the print on the eyeglasses was made by the *palm* (and not fingers) of the defendant's *right* hand. TR 3-182. See also TR 4-127, 4-137, 4-148 (Testimony noting "fingerpad" markings on the victim's thigh which appeared as if someone had pulled off the victim's panties and left scrape marks from his fingernails and/or palm). The jury may also have considered the prosecutor's alternate hypothesis that the defendant had washed his hands in the creek.[10] Again, an adverse inference consistent with guilt was neither implausible nor unlikely based on the evidence presented.

### iii. Fiber and Hair Evidence

The central evidence upon which petitioner focuses is head hair and fibers located on and around the victim's body which could not be traced to the petitioner or to the victim. Petitioner argues strenuously that all of the unmatched fiber and hair evidence must have come from a third party, an as-yet unidentified perpetrator. Petitioner made the same argument at trial and again on appeal where it was rejected by the Kentucky Supreme Court. Guided by both the *Jackson* standard and with due deference to the state court's application of that standard, this court likewise rejects petitioner's argument that the unmatched fiber and hair so strongly counters the evidence against him that his conviction cannot be upheld.

Barbara Wheeler, a forensic analyst with the Kentucky State Police, testified that she found a single Caucasian head hair on the victim's pantyhose (which were hanging on a nearby

---

[10]The Commonwealth theorized that Jeffries may have returned to the scene after washing his hands in the creek, based on evidence that he was observed in the creek bed close in time.

bush) as well as some Caucasian head hair on both the victim's clothing and the defendant's

clothing that could not be matched to the head hair samples of either the victim or the defendant.

The single head hair found on the pantyhose was clearly not the victim's or the defendant's head

hair.  Other hair and/or fragments were simply "too limited for analysis" and therefore could not

be identified as belonging to either defendant, the victim, or a third party.  TR 3-223, 3-224.  The

record is unclear as to whether the unknown hair on the victim's clothing matched the unknown

hair on the defendant's clothing since the expert did not compare any of the "unmatched" hair

fragments to each other.  In addition to the unidentified human hair fragments, she testified that

animal hair was found on both the clothing of the victim and the defendant.  TR 3-224.

  Wheeler testified that foreign fibers also were removed from rocks and articles of the

victim's clothing.  While foreign to the object on which they were found (the rock or the white

slip, for example), she testified that some of the foreign fibers matched the victim's blue cotton

skirt.  Other fibers that could not be identified as originating from the clothing of the victim or

the defendant were found on the victim's clothing and a large rock (suspected murder weapon).

Those fibers included black fibers, a red fiber, two purply brown fibers, two brown fibers, a gray

fiber, a yellow fiber, a clear fiber, plant and paper fibers.  TR 3-232 to 3-248.

  Contrary to petitioner's theory that the hair and fibers must have been left by another

perpetrator, Wheeler provided the jury with expert testimony in favor of the prosecution.  She

testified about the ease and commonality with which both hair and fiber evidence is transferred

from one person to another.  For example, the average person can lose 100 hairs during a day.

TR 3-229.  Although contact can enhance the transfer of hair or fibers, she testified that a person

can easily transfer hairs or fibers even in the absence of *any* contact with another individual.  TR

3-227 to 3-229.  Wheeler then explained that the foreign fibers found on the victim's clothing could have come from her closet, from casual contact with a friend, or even from going to the store.  TR 3-251, 3-252.  Based on this testimony, it is reasonable to assume that the same "transferred" fibers would be found on the rocks used in the crime.  Another witness testified having seen the victim wear a blue or black toboggan (hat) which was never recovered, which might also have accounted for some of the unknown fibers.

The defendant offered no evidence in opposition to the testimony supporting the prosecution's explanation of the foreign hair and fibers.  Thus, the existence of this evidence does not require reversal under the *Jackson* standard, which requires this court to view the evidence in a light favorable to the prosecution.   The jury may well have believed based upon the expert's explanation that the unidentified head hair originated from a third person at the grocery store or elsewhere who had nothing to do with the crime and was merely transferred from another piece of clothing (whether the victim's or the defendant's) before or during the crime.  In short, there was no contrary testimony to suggest that the fibers *more probably* originated from an unidentified perpetrator rather than from the innocent and common exchanges of such fibers in the course of day-to-day living.  In light of the uncontested expert testimony of how easily fibers are transferred, and evidence that the defendant's clothes had been washed free of foreign fibers, it was not unreasonable for the jury to reject the defendant's alternative hypothesis for the unidentified hair and fibers.

### iv.  The Short Time Frame

At trial, on appeal and in this proceeding the petitioner assails what he argues was an impossibly tight timeline constructed by the prosecution, whereby the whole crime would have

24

had to have been committed by the defendant within 15 minutes.   This argument is no more than a smoke screen that evaporates when illuminated.  Even if the defendant's explanation were credited (that he tripped over the body), the crime would have had to have been committed by *someone* during the same short time span based upon the same evidence on which Jeffries relies as consistent with his innocence.

The victim was observed alive and well at approximately 5:30 p.m.,[11] a short distance away from where her body was later discovered.  TR 2-4, 2-7, 2-8.  The defendant was seen leaving the nearby party alone around 5 p.m. TR 4-65.  He was not seen in the park by two teenage friends who looked for him at approximately 5:35 p.m., but was seen in the creek bed near the park behind the crime scene approximately 10 minutes later.  TR 4-49, 4-53.  There was water in the creek.  TR 5-106.  Jeffries walked away from the creek back towards Plainview Street, very close to the murder scene.  TR 4-21, 4-49. His friends walked up to Plainview from the park, emerging a block away.  Ben Mills yelled loudly to get his attention, and testified that Jeffries acted "like he was going to puke."  TR 4-50.   Jeffries turned and waved, but then proceeded to walk from Plainview on Saunders toward Ashland.  Mills cut through yards toward Ashland expecting to catch up with petitioner, but did not see him again.  Mills and Gibbs then returned to 929 Ashland at 5:47 p.m.   Petitioner's father testified that he had been driving around looking for petitioner but did not see him until around 5:50 p.m. on Ashland near their home, again a few minutes from the crime scene, but *after* he allegedly stumbled across the body.   Therefore, the evidence at trial (including the defendant's own testimony) suggested that

---

[11]As the Commonwealth argued in the state courts, the time of 5:30 was provided by the witness as an approximation.  Accord Doc. 7-8 at 7 (interview notes that a William Cumberledge placed time at around 5 p.m.); 7-8 at 19 (same 5 p.m. observation from a Steve Riggle).

the crime was committed between the sighting of the victim around 5:30 p.m. and defendant's reappearance around 5:47 p.m.  The existence of the short time frame makes it no less probable that Jeffries was the perpetrator.  If anything, the time frame is more consistent with guilt. Otherwise presumably the "interrupted" murderer/rapist would have been visible to Jeffries, given that the murder had to have occurred within moments of the defendant's appearance at the scene in daylight.

Contrary to the *Jackson* standard which requires construction of the evidence in the prosecution's favor, Jeffries' "most probable" theory required the jury at trial (and by extension this court) to construe all of the evidence in his favor, in a way that hardly seems plausible.  The jury would have been required to believe that the same murderer who had just brutally bludgeoned the 140 pound victim to death, who was about to rape the victim, quickly stopped what he was doing and successfully concealed himself in an unknown location in a side yard. Photos of the area were in evidence.  Jeffries' theory further required the jury to believe that the murderer abruptly stopped his actions to avoid being discovered by an allegedly drunken 110 pound teenager who was close enough to be heard, but far enough away for the murderer to conceal himself and disappear in the same small area without being seen.  And that all of this (completion of the crime and concealment) occurred during the same fifteen minute span of time that Jeffries argues was too short for Jeffries to have committed the crime.  Even though the state court did not specifically refer to the time frame in reviewing the evidence on direct appeal, consideration of the evidence by this court provides no grounds for federal habeas corpus relief under *Jackson*.

### v.  Defendant's Physical Abilities

The defendant argues that another fact undermining his convictions is the implausibility of him having physically picked up and moved the 140 pound victim from the point of the initial struggle on the sidewalk/driveway area to the side yard where she was murdered.  Two years after the murder at the time of trial, at just 17 years old, the defendant stood 6 foot 3 and weighed 200 pounds.  TR 6-53.  However, he testified at trial that he weighed only 110 pounds and was approximately 5 feet 11 at the time of the murder.  The jury was provided only with this limited testimony concerning the defendant's height and weight; neither corroborating evidence of Jeffries' physique nor evidence pertaining to his build (whether he lifted weights, for example) were introduced by either party.

Two reasons require rejection of defendant's theory as inconsistent with the *Jackson* standard.  First, it is possible that the jury did not believe Jeffries' self-serving testimony that he had  nearly doubled his weight in just two years, based on their common experience and knowledge, the absence of corroborating evidence, and other reasons to discredit the defendant's testimony.

Second and more importantly, even if the jury did credit Jeffries' testimony concerning his weight gain of 90 pounds, the testimony on how the victim was moved from the street/sidewalk area to the side yard did not require acceptance of Jeffries' theory that she was physically picked up and moved.  The only testimony on the issue came from the coroner, who explained that the autopsy showed no evidence that her body was dragged along the ground between those two points, because there was no tell-tale pattern of bruising that one would expect to find if a prone body were dragged.  Rather, Dr. Nichols acknowledged that all he could

27

tell was that the victim was "*either mobile*, or she was picked up and moved" from the sidewalk area to the side yard.  TR 4-143 (emphasis added).  Even if the defendant stood 5' 11" and weighed only 110 pounds, the jury might reasonably have believed that his height advantage and youth (coupled with the element of a surprise threat) permitted him to force the victim off the driveway down into a downward sloping side yard before murdering her with a rock.[12]  Once she was hit with the rock, her injuries were such that she would have been unable to scream.  TR 4-143.

### vi.  Alleged Police Rush To Judgment

The defense presented only two witnesses on direct (the defendant himself and his father) but counsel devoted much of the cross-examination to bolstering the defense theory that the police failed to explore other possible suspects, even when they later found unmatched hair and fiber evidence.  Defense counsel also explored in depth on cross-examination the failure to test some forensic evidence and failure to assess a footprint visible in video footage of the crime scene.  The record reflects success on the part of defense counsel in proving that Billy Jeffries was the only suspect seriously pursued by police even before the palm print and blood evidence were matched to the victim, as well as after the discovery of that forensic evidence.  However, that fact does *not* mean that the police were wrong.   Investigators explained their reasons for pursuing Jeffries based on tips they had received and witness accounts, as well as inconsistencies in the defendant's story.  An arrest was not made until they had a definitive match of Jeffries' palm print on the victim's glasses.  Jeffries' argument is that police failed to look for a zebra

---

[12]Similarly, there was no testimony that the muddy fingerprints on the victim's buttock meant that the perpetrator physically lifted the entire weight of the victim, as opposed to having placed his hand there while she was still standing or having slid his hand under the body.

28

after hearing hoofprints.   However, evidence that the defendant quickly became (and remained)

the sole suspect does not mean that the jury was required to believe the defense theory that

police got it wrong.

### vii.  Considering All the Evidence

Petitioner complains that the state court erred by ignoring or insufficiently considering

some of the evidence presented at trial.  However, petitioner himself ignores portions of the trial

record that provided the jury with strong evidence of defendant's guilt, including evidence that

the defendant took his jacket to a seamstress for repair within two days of the murder and the

defendant's own incredulous testimony.

The seamstress, Kay Franklin, testified that she was working at Perry Cleaners around

the time of the murder.  The defendant brought in his torn jacket and asked her to repair it days

before they accused him of murder.  TR 5-194.  Specifically, he asked her to repair a torn left

pocket, which was ripped near the seam from the top of the pocket.  The stitching of the seam

was not merely popped, but the fabric was ripped apart.  TR 5-203, 5-204.  She testified in detail

as to the location of the repair, pointing out the difference in her stitching on the pocket from the

factory stitching.  According to Ms. Franklin, the defendant explained at the time that he had

ripped the pocket while playing football and wanted to have it repaired because his mother had

bought him the coat.  TR 5-197.  He picked it back up a couple of hours later when the repair

was complete.  When she learned of the arrest days later she wondered if there was any

connection.  TR 5-204.  Alice Jeffries, the defendant's mother, worked nearby and talked a lot to

Ms. Franklin about how she did not like the fact that her son had been arrested.  TR 5-199, 5-

200.  At the time of Billy's arrest, Franklin did not tell the authorities about the repair because

she did not want to get involved.   However, she recalled telling her husband about having sewn

the jacket.  In addition, at the time of the arrest, she testified that she "did say to Joanne at the

cleaners... 'I hope that Billy did not do this and I sewed up the jacket.'" TR 5-201.  The jury also

heard testimony that microscopic blood was found on the edges of the same pocket parts of the

jacket, in quantities too small to be tested.  TR 5-171, 5-172.

The defendant's testimony on the repair of the jacket was quite different.  Both he and

Ben Mills testified that Ben Mills gave him the jacket.  He denied ever telling the seamstress that

it was from his mother.  TR 6-110, 6-112.  He testified that he took the jacket to be sewn before

the date of the murder, and that it was a patch in the back that had been sewn rather than the

pocket.  He did not recall the pocket having been ripped, but under repeated questioning,

conceded that "it may have been the pocket."  TR 6-112.  On redirect, however, he reiterated that

it was the back of the jacket that had been repaired and not the pocket.

Other than testifying that the jacket was repaired before the murder and not afterwards,

the defendant offered no testimony on when or how long before the murder the jacket was

repaired, how the tear occurred, or how blood ended up near the tear.  The testimony of the

seamstress by contrast was very detailed, including memory of her contemporaneous comments

to her husband and co-worker that she feared that the torn jacket might be related in some way to

the murder.  In comparison, Jeffries' own testimony on the issue was markedly vague and

contradictory.   Therefore, it was not error for the jury to credit the testimony of the seamstress

and to consider this additional evidence of guilt.

In addition to the jacket, other portions of the defendant's own testimony likely led the

jury to reject his testimony that he merely stumbled over the body.  The defendant readily

30

admitted that he lied to the police repeatedly, on three separate occasions, during the course of the investigation.  On many occasions the defendant's testimony contradicted that of other witnesses.  There were also internal inconsistencies in the defendant's own testimony.  For example, the defendant testified that when he left the party alone, he walked in the direction of the park but at some point heard someone calling him or shouting at him not to go to the park.  He "hunted around" and did not see who it was who had yelled at him or anyone else before proceeding home.  TR 6-84, 6-67.   However, he later testified that he "don't remember no one calling" shortly before his father picked him up.  TR 6-113.

Several witnesses (Gibbs, Mills, and his father) testified that they looked for Jeffries in the neighborhood around the time of the murder but could not locate him.  The defense suggested that was because, after hearing the unseen person warn him away from the park, Jeffries decided to continue walking toward his house through various backyards rather than taking the more visible street route.  However, Jeffries could not recall climbing over or under multiple fences separating those same back yards, even though photographic evidence and testimony suggested that the defendant would have had to have done so if he traversed the path he claimed.  TR 6-68.

The defendant testified that he was cutting through the side yard where the body was found when he tripped over it.  He turned around to see what he had tripped over, saw that it was a body, got scared and took off running toward his house.  TR 6-68.  He reached Ashland where his father picked him up shortly thereafter.  He did not say a word to his father about seeing the body because his father was "screaming and hollering" and his mother was also upset with him for being late.  TR 6-69, 6-70.  He did not want to admit that he was drunk or tell about the body

31

because they were mad at him.  TR 60-70.  However, he did not tell them later either.

On February 27, when the police first questioned him, Jeffries testified he did not tell police the truth because he feared they would not believe him.  TR 6-70.  Instead he lied and told them he took a different route when he left the party back to his house.  TR 6-81.  When asked to show them, he led them along the incorrect route.  When asked why he lied to the police, he responded:

> I didn't want to let them know that I was right there, you know.  They knew that I was (inaudible), but I didn't want them to know.  You know, I thought that they were fine and I wouldn't have to say what happened.  I thought that they were fine (inaudible).

TR 6-83.

Police came back a second time later the same day and asked him for his clothing; he again declined to tell them the truth.  He lied a third time when he provided police with his palm prints.  On that date, petitioner continued to assert he had not cut through the yard where the murder occurred in at least two years.  Doc.7-3.  In addition to lying about his route, he initially told police that he did not leave the party until 10 or 15 minutes before 6 p.m. (contradicting the testimony of other witnesses).  He also falsely claimed that he had never seen Mrs. McKee, and that he did not know where the body had been found.  TR 6-101.  When questioned about his failure to correct his lies, he testified that he didn't believe it was necessary since he "assumed that they was going to find out that I didn't kill Ms. McKee."  TR 6-89.

When asked when he figured out the body was Mrs. McKee, the defendant first testified that it was "days later, when – (inaudible) when they started talking to me, I knew that it had to be."  TR 6-101.  Perhaps realizing the improbability of this statement, he then corrected his testimony to state that it was the next day, when the news showed people out looking for Mrs.

32

McKee's body.  TR 6-102, 6-103.

Defense counsel interposed an objection at trial to questioning about the defendant's failure to tell his parents on grounds that the defendant had a right to remain silent  after his arrest on March 3, 1995.  TR 6-93.  The defendant was permitted to testify that from March 3 until his testimony at trial, he had never explained his story (that he stumbled over the body) because counsel told him not to talk to anyone about the case.  TR 6-115.  The trial court also instructed the jury that they were "to draw no inference from the fact that Billy Jeffries – Billy Jeffries followed his attorney's advice after the arrest not to discuss the facts of this case with anyone, including his family."  TR 7-53.

Nevertheless, the jury was free to draw an adverse inference from the facts that the defendant repeatedly (and admittedly) lied to police three times *before* his arrest, that he lied to his parents, and that he failed to tell *anyone* that he had stumbled over the bloodied body of the victim from the night of murder on February 20, 1995 until his arrest on March 3, 1995.   The jury was also free to weigh the defendant's credibility as he told his story for the first time two years later at the time of trial, including inconsistencies in that story.

The jury may well have found it improbable that a 15 year old, stumbling over a bloodied body in daylight on the way home but otherwise innocent, would not say a word to anyone about that fact but instead would simply change his clothes, shower, and proceed with his normal routine.  The jury might well have disbelieved the defendant's testimony that he tripped without realizing it was a body until he looked back and that he could not tell whether that body was male or female, despite the daylight and the fact that the victim was wearing a hiked up skirt, with her blouse torn open and breast partly exposed, and her panties and pantyhose removed.

33

The jury might well have found it unlikely that after the trauma of tripping over a such a bloodied body, the defendant did not say a word to anyone, including his parents, because it would somehow require him to admit that he had been drinking.  Likewise the jury may have found it implausible that an innocent teenager would continue to decline to say anything after news broke of Mrs. McKee's disappearance and the corresponding massive search for her. Finally, the jury had before it evidence of multiple past lies to authorities upon questioning, and evidence that the defendant might be lying on the stand given the inconsistencies of his account compared to that of other witnesses.  *See Wright v. West*, 505 U.S. 277, 296,112 S.Ct. 2482 (1992)(holding that a jury was entitled to disbelieve the defendant's "uncorroborated and confused testimony" and "was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt").

The trial court rejected the defendant's "mere presence" theory, both in the context of a motion for directed verdict and by denying a tendered instruction.  The Kentucky Supreme Court rejected the same "mere presence" argument on direct appeal.  The defendant continues to argue that the evidence as a whole supports only his "mere presence" - not that he actually committed the crimes.  *See Brown v. Palmer,* 441 F.3d 347 (6th Cir. 2006)(affirming writ of habeas corpus for conviction on aiding and abetting armed robbery and carjacking, because the state had presented nothing more than "reasonable speculation" concerning the defendant's intent and "viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

Unlike *Brown v. Palmer*, in this case there was never an identified "real" perpetrator other than Jeffries.  For every piece of "evidence" that allegedly favored Jeffries' theory of an

34

unknown perpetrator, the prosecution offered an equally or more plausible view of the evidence consistent with Jeffries' guilt.  By contrast, the defense theory was undermined by strong circumstantial and  and forensic evidence, as well as by inconsistencies in the defendant's own testimony.

*Jackson* requires that a reviewing court to view the evidence in the light most favorable to the prosecution.  In this habeas corpus proceeding, Jeffries refrains from arguing actual innocence, instead arguing that the evidence presented favors his theory of "mere presence." Ultimately, the inquiry for this court is not whether the jury "made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit."  *Herrara v. Collins,* 506 U.S. at 402 (emphasis original).  Having reviewed the trial transcript, I am convinced that the whole of the evidence offered much more than "reasonable speculation" on which the jury could convict.  When viewed in favor of the prosecution, the circumstantial and forensic evidence identifying petitioner as the perpetrator is constitutionally sufficient.

Petitioner has failed to show any error in the state court's findings of fact or descriptions of the evidence against him, or that the court erred in applying *Jackson v. Virginia*.  *Jackson* affirmed that in order to prove guilt beyond a reasonable doubt, a prosecution has no duty "to rule out every hypothesis except that of guilt beyond a reasonable doubt."  *Id*, 443 U.S. at 326 (fact finder entitled to reject defense that required "improbable inferences from the basic facts" to explain shooting of the victim).  Because the state court's decision is not contrary to and does not involve an unreasonable determination of the facts or an unreasonable application of clearly established federal law, petitioner is not entitled to relief under 28 U.S.C. § 2254.  *Accord Apanovitch v. Houk*, 466 F.3d 460 (6th Cir. 2006)(rejecting habeas challenge to sufficiency of

evidence for rape and murder convictions based on circumstantial evidence, even though no physical evidence directly linked the defendant to the crime scene and unidentified hair and fingerprints were found).

### C. The *Brady* Claim

Petitioner's second claim is that the state courts erred by rejecting his claim under *Brady v. Maryland*, 373 U.S. 83 (1963), by interpreting federal case law in a "manner that is flatly contradicted by the text of the *[United States v.] Bagley* decision." Doc. 2 at 21.  The essence of the claim is that evidence of John Dillon's identity as the real perpetrator was wrongly suppressed by the Commonwealth. *Id.*   I previously determined that this claim "presents closer issues than petitioner's *Jackson* claim," but determined that petitioner was entitled to no relief because the state court's rejection of the claim in post-conviction proceedings did not involve an unreasonable application of clearly established federal law.  The motion for a new trial and all relevant evidence, transcripts, briefs, and opinions pertaining to those post-trial proceedings were filed of record with the original petition and reviewed by this court prior to the filing of its April 2006 R&R.  That evidence has been reviewed anew, combined with this court's review of the more recently filed trial transcript, pursuant to the Sixth Circuit's remand instructions. Having now completed review of the entire state court record, I arrive at the same legal conclusion a second time.

Petitioner first presented his *Brady* claim in a motion for a new trial filed in state court, citing newly discovered evidence that the prosecution had failed to disclose the name of John Dillon in response to a pre-trial discovery request.  As detailed in the Sixth Circuit's opinion, petitioner's theory of Dillon's involvement is based upon the hearsay statements of several

36

witnesses discovered after trial.  Prior to trial, Detective Babiarz interviewed John Dillon but did not reveal to Jeffries that he had been interviewed.

Petitioner's motion for new trial was based upon two distinct theories: 1) the *Brady* suppression claim,[13] and 2) a claim that the newly discovered evidence entitled him to a new trial under state law.  Doc. 2-4.  Only the *Brady* claim is cognizable in this federal habeas review.

The state trial court held a full evidentiary hearing on petitioner's motion to permit Jeffries to present evidence on both claims, including the nature of Dillon's alleged involvement and whether the Commonwealth improperly suppressed information under the standards set forth in *Brady v. Maryland*.  Ultimately, the trial court agreed that Dillon's name should have been disclosed in response to a specific pretrial request for information regarding individuals who were questioned.  However, the trial court held that petitioner was not entitled to relief because there was no reasonable probability that had that evidence that was known about Dillon *prior* to trial been disclosed, that the outcome of trial would have been different.   The Kentucky Court of Appeals affirmed.

### 1. Kentucky Courts' Rejection of *Brady* claim

In light of the deference due to the state courts' determination under 28 U.S.C. §2254, the opinion of the Kentucky Court of Appeals is extensively quoted below, including portions of the opinion that relate primarily to Jeffries' non-constitutional state law claim:

> Jeffries filed his RCr 10.02 motion in the trial court contending newly discovered evidence, that subsequent to Jeffries's conviction, the Shelbyville

---

[13]As noted by the Sixth Circuit, the *Brady* claim was further divided into two:  that the Commonwealth failed to disclose damaging evidence discovered in *pre*trial investigation (the "confessions"), and that the Commonwealth failed to reveal Dillon's March 1995 interview.  The first claim was later abandoned based on the evidence.  See Doc. 2-4.

police were investigating the possibility of additional suspects in Mrs. McKee's homicide. The motion contended the Commonwealth's theory at trial was that Jeffries acted alone. However, the Commonwealth had been investigating other potential suspects, and in discovery, had listed some sixty-five names of suspects or tips (although not the name, John Dillon). The motion also contended that the post-conviction investigation revealed evidence that a John Dillon had committed the crime, that a Linda Raisor provided the police with the name John Dillon, whom she suggested publicly admitted killing someone. A former probation and parole officer placed John Dillon within 7/10ths of a mile from the crime scene shortly after the murder. Chris Beach, an inmate at the Shelby County Jail, claims to have heard Dillon implicate himself in the murder. Supposedly, a girl named Tammy was also in the room when Dillon made the statement. A Pochahantas Biggers was supposed to have indicated that John Dillon had admitted to killing Mary McKee and she told Linda Raisor, who then told the police. A Tiffany Solace told a deputy sheriff that Dillon had murdered Mrs. McKee. John Dillon's former girlfriend supposedly heard him make statements and even admitted committing the murder to her. A Nicki Chesser was also supposed to have information about John Dillon's statement.

Based on the allegations in the defense motion, the trial court granted Jeffries a hearing on April [sic] 17, 1999.[14] The defense did not present witnesses at the hearing but did present attachments to its motion. The first attachment was a letter from the special prosecutor to defense counsel. The March 2, 1998, four-page letter summarized the investigation into John Dillon's alleged involvement in the murder. Also attached were quoted portions of the Commonwealth's opening statement and of the closing argument. The supplemental report of Detective Mike Pratt of his investigation was attached. Detective Rick Babiarz's report was attached as well as the defense's request for exculpatory evidence. Affidavits from Nikki Chesser, Chris Beach, and Billy Jeffries were attached. At the hearing, the defense became aware that the police had actually brought John Dillon in for questioning prior to Jeffries's conviction and had taped the interview. That tape was either lost or destroyed by the time of the motion and John Dillon had been eliminated as a suspect by the police. The trial court allowed the defense to also argue that suppressing John Dillon's name as a suspect in discovery amounted to a denial of exculpatory evidence which would also entitle Jeffries to a new trial.

The trial court conducted an extensive hearing, allowed the parties to file briefs, and made these findings on the newly discovered evidence:

The Defendant claims that he is due a new trial because the

---

[14]The transcript of the hearing is dated May 17, 1999, not April.

Commonwealth was arguing to a jury at trial that the Defendant was the killer while the Commonwealth had information that someone else had told Pochahantas Biggers that he had killed the victim, Mary Evelyn McKee. The Commonwealth has convincingly shown that it did not learn of any statement attributed to Ms. Biggers until months after the trial. Further, the Commonwealth has demonstrated that Ms. Biggers denies making such a statement to Linda Raisor, the woman who claims that Ms. Biggers told her about another person claiming responsibility for the murder. Ms. Raisor is a cousin of the Defendant's father, who has worked for Ms. Raisor. Ms. Raisor has known the Defendant since he was four years old. Given Ms. Biggers denial of ever telling Ms. Raisor that she overheard somebody confess to the crime and the closeness of Ms. Raisor to the Defendant's family, there is ample reason to doubt that the alleged statement of Ms. Biggers was made. This information does not warrant a new trial, as it would not with reasonable certainty change the verdict in this matter.

The Defendant is not entitled to a new trial based upon the affidavit of Nicky Chesser. Ms. Chesser's affidavit is no more than a statement that John Dillon told her that he killed the victim. Mr. Dillon denies making this statement and no eyewitness or forensic evidence links him to the crime. Mr. Dillon's denial and alibi were not impeached by any credible source. Further, the affidavit of Ms. Chesser dated June 3, 1998, reflects that Mr. Dillon allegedly told her about his responsibility for the murder during the summer of 1996. This would therefore have been known to Ms. Chesser months before the Defendant's March 1997 trial. The failure of Ms. Chesser to come forward with this information before trial further casts doubt upon its reliability. Under all of the circumstances, the statement of Nicky Chesser would not with reasonable certainty have changed the verdict in this case.

The Defendant is not entitled to a new trial upon the affidavit of Chris Beach. Mr. Beach's own statements are suspect due to his contradiction of himself. He originally claimed that he saw John Dillon with a girl and overheard him describing a screaming old lady with whom John Dillon was going to take his turn when someone else got done, and that she kept screaming and he had to kill her. Mr. Beach's subsequent affidavit reads that he does not remember if Mr. Dillon said "I" did not mean to kill "her" or "we" did not mean to kill "her" and after that, Mr. Dillon was scared and crying. The inconsistency of the two Beach statements

39

undermines his reliability and does not demonstrate that the claims of Mr. Beach would with reasonable certainty change the verdict.

The statement attributed to Tiffany Solace that both Mr. Dillon and the Defendant were involved in killing Ms. McKee would not with reasonable certainty change the verdict. The statement was merely a declaration that both men were involved in the crime, with no basis or underlying knowledge to support the statement provided. Such an unsupported comment does not undermine confidence in the verdict.

The Defendant contends that perhaps other people (of whom the Defendant had knowledge but did not produce any information from them pursuant to the new trial motion and proceedings) might have some knowledge regarding this case. Speculation about what somebody might know does not give rise to a reasonable certainty that the verdict would have been different.

[August 29, 2001 Order of the Shelby Circuit Court at 2-3, Doc.2-13, at 55],.

The defense's second theory contended the Commonwealth's failure to disclose the name and interview of "John Dillon" was a denial of exculpatory evidence and grounds for a new trial. The trial court found that:

The statement of John Dillon, as described in the affidavit of Detective Rick Babiarz, shows that Mr. Dillon said that he was not in Ms. McKee's neighborhood at the time of the murder and that he did not know where the Defendant was at the time of the murder. This statement does not implicate Mr. Dillon in the murder and it does not implicate or exculpate the Defendant. This information was not favorable to the Defendant and he was not prejudiced by not having access to the statement. The statement was not material, as it does not give rise to a reasonable probability that its disclosure would have changed the outcome of the trial.

...The trial court concluded that "None of the Defendant's new trial claims affect any of [the] evidence [against Jeffries]....The evidence against the Defendant was strong and the new trial claims are unpersuasive, as they would not with reasonable certainty or with reasonable probability have affected the verdict." The trial court denied the motion but did order a special grand jury to hear all the evidence presented against John Dillon.  The grand jury did not return an indictment against John Dillon....

40

On appeal to this Court, Jeffries's first allegation of error is that the trial court erred in not granting a new trial because the newly discovered evidence casts serious doubt upon Jeffries's conviction.  The decision to grant a new trial rests within the sound discretion of the trial court. ...[and] 'must be of such decisive value or force that it would with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted.'" We believe that the trial court was correct in its analysis of the newly discovered evidence.  The trial court had a number of allegations and theories in the motion which did not hold up at the April [sic] 17, 1999, hearing. Although John Dillon was a suspect, Pochahantas Biggers denied that she ever told Linda Raisor that someone else claimed responsibility for the murder. John Dillon was placed within 7/10ths of a mile of the crime scene with enough time to get to the scene, but no other evidence of him actually involved in the crime. The inmate, Chris Beach, claims to have heard Dillon implicate himself in the murder. However, his statements do not clear Jeffries, but implicate Dillon also. Tiffany Solace supposedly heard the statement by Dillon, but again, if said, this would not clear Jeffries, but would implicate Dillon as an accomplice. Nicky Chesser supposedly heard Dillon say <u>before</u> Jeffries's trial that he killed Mrs. Mary Evelyn McKee. Like the trial court, we question why this witness did not come forward before the trial. Nevertheless, this statement alone, with all the other evidence pointing toward Jeffries's guilt, would not change the outcome of the trial.

Jeffries's second theory contends that the lower court's denial of a new trial based on a denial of exculpatory evidence violated his due process right to a fair trial. Jeffries is alleging that his discovery request for a list of suspects entitled the defense to John Dillon's name and the contents of the police interview. With this evidence, the defense contends <u>it</u> <u>could</u> <u>have</u> discovered the exculpatory evidence <u>before</u> trial. (Although the Commonwealth conducted a post-trial investigation, it was not until <u>after</u> the trial that the Commonwealth learned of the exculpatory evidence.) We agree, as did the trial court, that the defense was entitled to John Dillon's name before trial as a suspect, which could have led to exculpatory evidence. However, the fact that further investigation of John Dillon could have led to exculpatory evidence does not necessarily entitle Jeffries to a new trial.

We can all agree that evidence which helps establish that another person (<u>i.e.</u> John Dillon) may have been responsible for the killing is exculpatory. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In the case sub judice, there was a discovery request for a list of suspects, and John Dillon's name was not given to the defense before trial. In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the United States Supreme Court stated "Society wins not only when the guilty are convicted but when criminal trials are fair...." The Court was reviewing a case wherein the prosecution suppressed evidence favorable to an accused. In deciding whether or

41

not due process required a new trial, the Court determined the test was whether the evidence was material, irrespective of the good faith or bad faith of the prosecutor. *Brady*, 373 U.S. at 87.

When is the evidence material? *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), reviewed a case similar to the present case which also involved a murder (in the Old French Quarter in New Orleans) and another suspect that did not appear at trial for the prosecution. The New Orleans police knew about this suspect prior to trial and even used his assistance in recovering evidence against Kyles. Kyles gave a number of inconsistent statements to the police, and if he did not do the crime himself, appeared to have been an accomplice. The exculpatory and impeaching statements evidence was suppressed. At trial, [FN1] Kyles's defense was that the eyewitnesses were mistaken in their observations and that he had been framed by "Beanie." Unbeknownst to Kyles, Beanie was the police informant that gave conflicting statements and other evidence pointing to Beanie as the murderer. The prosecution did bring Beanie into the courtroom so the eyewitnesses could chose between Beanie and Kyles, but continued to suppress the exculpating evidence. Kyles was convicted of murder and sentenced to death. On review, the Supreme Court referred to precedent, including *Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 and *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), to reaffirm that, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles*, 514 U.S. at 433 (citation omitted).

FN1. The first trial resulted in a mistrial.

The *Kyles* Court discussed the materiality of the exculpatory evidence at great lengths in its discussion of the "[f]our aspects of materiality under Bagley ..." *Kyles*, 514 U.S. at 434. We agree with Jeffries that the Court did say "[a] 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial' ". *Kyles*, 514 U.S. at 434 (citation omitted). However, the Court was not changing the *Bagley* test of materiality as Jeffries contends. *See also Wood v. Bartholomew*, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995).

Jeffries's argument concerning the application of the materiality test is a red herring. If the exculpatory evidence was available to the prosecution before the trial, we would have no reluctance in reversing and remanding for a new trial under *Kyles*, *Bagley*, and *Brady*, and *Funk v. Commonwealth*, Ky., 842 S.W.2d 476 (1992). What we have in the current situation is the suppression of the name and interview of a suspect before trial. Neither the name nor the results of the

42

interview are in themselves exculpatory. This case is similar to *Wood v. Bartholomew,* wherein the Supreme Court quoted (with approval) the Federal District Court's analysis of the suppressed evidence as being not exculpatory evidence but "[t]he information withheld only possibly could have led to some admissible evidence." *Wood*, 516 U.S. at 5 (emphasis original). *Wood* involved a couple of witnesses (in a murder case) that were given polygraph examinations (the results of which were not admissible at trial in the State of Washington). The witnesses did not do very well. In fact, one (Rodney) failed so badly that he should have become a suspect as an accomplice either before or after the fact. The police did not follow up on this lead and did not disclose the fact that the polygraph was even given.

Not only was the failure to disclose the results of the polygraph not itself considered exculpatory evidence, but the Court looked at the evidence against the defendant and concluded that "In short, it is not 'reasonably likely' that disclosure of the polygraph results--inadmissible under state law--would have resulted in a different outcome at trial. Even without Rodney's testimony, the case against respondent was overwhelming." *Wood*, 516 U.S. at 8. In Jeffries's case, the trial court made findings that none of the new trial claims affected the evidence against Jeffries, and after summarizing the evidence concluded: "[t]he evidence against the Defendant was strong and the new trial claims are unpersuasive, as they would not with reasonable certainty or without reasonable probability have affected the verdict." We agree.

Doc. 2-15 at 2-13 (10/17/03 Kentucky Court of Appeals opinion).

This federal court may grant relief under §2254 only if the above adjudication of the issues was "contrary to, or involved an unreasonable application of, clearly established federal law," or derived from an "unreasonable determination of the facts." 28 U.S.C. §2254(d)(1) and (2). Petitioner argues that in this case, the state courts' rejection of his *Brady* claim was based upon an unreasonable application of Supreme Court law.

### 2. Error of Fact Re Disclosure of Dillon Name

Before addressing petitioner's claim of legal error, I review a separate challenge by the Commonwealth to a finding that Dillon's name was not disclosed to petitioner.   On appeal of the denial of Jeffries' motion for new trial before the Kentucky Court of Appeals the

Commonwealth conceded that it did not include the name of John Dillon in response to a specific discovery request for information of individuals interviewed.  The Commonwealth made a similar concession in its first brief in this federal proceeding.  Doc. 7-2.

Nevertheless, the Commonwealth previously argued and re-asserts again in this remanded proceeding that Dillon's *name* was in fact disclosed in pretrial discovery to defendant -despite the failure of the Commonwealth to include his name in response to a *particular* discovery request - through the notes of Detective Babiarz.  Babiarz's notes reflect an interview with a former probation officer, Mike Miller, who stated that he observed John Dillon with an unidentified white male between 5:10 and 5:20 p.m. less than a mile from the crime scene on the date of the murder.  *See, e.g.,* Doc.7-8 at p.9 (Babiarz interview notes of 3/7/95); Doc.7-8 at 66 (Commonwealth's response to defense motion for exculpatory evidence, noting disclosure of 185 pages of police notes including all interviews from neighborhood canvass); Doc.7-9 at 9-11 (defendant provided with typed notes of Det Dennis Stockton as well as notes of Rick Babiarz, Officers Yount and Grant regarding their canvass of McKee neighborhood, including interview with Mike Miller); Doc.7-10 at p. 31 (pretrial discovery received by defendant reflects the name of John Dillon).  The detective's note of his interview with Miller dated March 7, 1995 was appended to petitioner's motion for new trial and appears in the record as part of the Commonwealth's pretrial discovery response of October 31, 1995.  In light of the record proof that petitioner had in his possession *prior to trial* the *name* of John Dillon and evidence of his proximity to the crime scene near the time of the murder (through the interview notes pertaining to Miller), the Commonwealth now argues that the Kentucky Court of Appeals finding that "John Dillon's name was not given to the defense before trial," was "clearly erroneous."

44

Petitioner does not refute this evidence but rather argues that the doctrine of the law of the case precludes the respondent's challenge to this factual issue. Unlike the legal issue of procedural default concerning petitioner's sufficiency of the evidence claim, in this instance I find the doctrine inapplicable and therefore consider the respondent's argument on the merits.

While the doctrine appears to be applied equally to both prior findings of fact and law in the Sixth Circuit,[15] the doctrine need not be applied in the face of "extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817, 108 S. Ct. 2166, 100 L.Ed.2d 811 (1988)(quoting *Arizona v. California*, 460 U.S. 605, 618 n. 9, 103 S.Ct. 1382, 1391, n.8). That is precisely the situation here. *Accord Johnson v. Champion,* 288 F.3d 1215 (10th Cir. 2002). Moreover, in applying the doctrine on remand, a trial court remains free to consider any issues not actually decided. This precise factual issue arguably was not previously decided in that it was not discussed by the state courts and was never fully considered by the undersigned. *Quern v. Jordan*, 440 U.S. 332, 347 n. 18, 99 S. Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979).

The Commonwealth previously argued for the same factual finding in its first memorandum filed in this court - that even though it did not disclose Dillon's name in resposne to a discovery request for individuals interviewed, it disclosed investigatory notes that placed John Dillon within a mile of the crime scene between 5:10 and 5:20 p.m. Unfortunately, this court erred in overlooking in its prior review the distinction drawn by the Commonwealth - that it had disclosed key evidence pertaining to John Dillon even though it failed to include his name

---

[15]*Contrast Johnson v. Champion*, 288 F.3d 1215, 1225- 1226 (10th Cir. 2002)(suggesting that doctrine may be inapplicable to findings of fact as opposed to rules of law).

in a request for information pertaining to suspects.  While this court's prior error is regrettable, it is not fatal to the Commonwealth's presentation of the same argument in this remanded proceeding.  *Compare Palmer v. Bagley*, 2006 WL 3591963 (S.D. Ohio 2006)(finding on a more careful reading of the record that the defense had both been raised and was meritorious, contrary to prior finding); *see also Wirries v. Reliance Standard Life Ins. Co.*, 247 Fed. Appx. 870, 2007 WL 2301250 (9th Cir. 2007)(declining to apply law of the case doctrine on remand where prior decision was based on clearly erroneous findings of fact); *see generally* 28 U.S.C. §2254 (erroneous finding of fact by a state court not binding on federal court).[16]

In reviewing the Commonwealth's prior presentation of the same claim, this court adopted the state court's finding that Dillon's name was not adequately disclosed, suggesting that the respondent had failed to contradict the state courts' factual finding "that Dillon's name had been suppressed."    Doc.14 at 23.  A more careful reading of the record reveals that the Kentucky state courts never made any factual finding that the petitioner was unaware of Dillon's *name*, as opposed to his name "*as a suspect*."  The Kentucky Court of Appeals specifically found "that the defense was entitled to John Dillon's name as a suspect"  and that "there was a discovery request for a list of suspects, and John Dillon's name was not given to the defense before trial."  Doc.7-18 at 20.  The natural reading of the Kentucky Court of Appeal's opinion is that Dillon's name was not provided in response to a specific request for a list of suspects.  The state courts did not discuss or make any finding concerning the pretrial disclosure of Dillon's

---

[16]The respondent also argues that remand made this court's prior factual findings "a nullity." The appellate court's mandate neither adopted nor rejected any findings of fact; rather the appellate court directed this court to review a more complete state court record prior to deciding either claim presented.

name in the interview notes of Mike Miller.

To the extent that this court in its April 2006 R&R went beyond the finding of the state courts and suggested that Dillon's name was not disclosed to the defendant at all, I conclude that finding was in error.  Close examination of the trial court record demonstrates that the finding by the Kentucky Court of Appeals that Dillon's name was not disclosed "as a suspect" was also erroneous, to the extent that it significantly overstated the record.

Unlike the finding of the Kentucky Court of Appeals, the trial court did not find that the Commonwealth was required to disclose Dillon's name "as a suspect." In fact, the Commonwealth never conceded that it was required to disclose Dillon as a *suspect*, but only that it "should have" revealed that Dillon was interviewed on March 7, 1995.   Based on this more modest concession and evidence presented, the trial court held only that the defendant's lack of access to Dillon's March 1995 statement did not violate *Brady*.

The record shows that the Commonwealth failed to disclose Dillon's name on a list responsive to a specific pretrial request made on 9/28/95.  In that Motion for Exculpatory Information, the defendant sought:

> information regarding the investigation of any other suspects.  This request
> includes but is not limited to:
> A) Any individuals that were questioned.....[and]
> B) Any 'tips' that were received.

Doc.7-9, at 11 (Motion to Require the Commonwealth to Reveal Exculpatory Evidence Doc.2-9; *see also* Commonwealth's Second Response to Motion).  In response to that specific request, the Commonwealth disclosed investigative notes of at least 65 persons interviewed (including those of Mike Miller that placed Dillon within a mile of the murder scene).  The Kentucky Court of Appeals expressly referred to this request and response in noting that the Commonwealth "had

listed some sixty-five names of suspects or tips (although not the name, John Dillon)" but clearly erred by describing the broad request as one solely for "a list of suspects."  The defendant did make a separate request for a list of suspects, but the testimony at the May 1999 evidentiary hearing was that Babiarz did not include Dillon on that list (which included Jeffries and 11 others) and would not have done so, because he was never considered to be a "suspect" *prior to trial*.

In state court, Jeffries argued that the Commonwealth's specific error was in failing to include Dillon's name among the list of persons interviewed in response to his request for a list of "information regarding the investigation of other suspects" including "any individuals who were questioned."  Doc. 2-13 at 3-4 (Final Brief Regarding Defendant's Motion for a New Trial).  I conclude based on the record that the only suppressed information was that Dillon had been interviewed by Babiarz on March 7, 1995.  The record shows that the information was not disclosed in response to the defendant's pretrial request for information "regarding the investigation" of Jeffries including "tips" and the names of those interviewed.

### 3.  Petitioner's Claims of Legal Error

Having clarified a key finding of fact, I turn now to Jeffries' argument that the state courts erred as a matter of law by holding that the pretrial suppression of information known about Dillon was neither material nor prejudicial and therefore did not violate *Brady*.  To assert a cognizable *Brady* claim, "a habeas petitioner must show that 1) evidence favorable to the petitioner, whether exculpatory or for impeachment purposes; 2) was suppressed by the government, and 3) the petitioner suffered prejudice as a result."  *See Apanovitch v. Houk*, 466 F.3d at 474 (additional citations omitted).

48

A failure to disclose *Brady* evidence constitutes reversible error only when "there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *United States v. Bagley,* 473 U.S. 667, 682 (1985); *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987); *Wood v. Bartholomew*, 516 U.S. 1, 5-6 (1995). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome does not establish materiality in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 112, fn.20 (1976).  Thus, this court must first review the nature of the evidence that was not disclosed to Jeffries at the time of trial.

### a.  Whether "Favorable" Information Was Suppressed

At the post-trial evidentiary hearing held by the state court on May 17, 1999 on petitioner's motion for a new trial, Detective Babiarz testified about evidence collected during his pre-trial interview of John Dillon.  Babiarz testified that police were prompted to speak with John Dillon following their initial canvass of the neighborhood, based upon reports of an unidentified black male having been in the area by some witnesses, knowledge that Jeffries and Dillon had been in trouble together in the past,[17]  and the report of former Probation and Parole officer Mike Miller having identified Johnny Dillon, a black male, nearby at around 5:10 or 5:20 p.m. that day with an unidentified white male.  Jeffries was arrested on March 3, 1995.  Babiarz

---

[17]The trial record reflects the suppression of undisclosed evidence as well as to the exclusion of the defendant's prior juvenile record.  Apparently, Jeffries was alleged to have committed the crimes while on home incarceration for previous crimes, and was scheduled to meet with his probation officer the evening of the murder.  *See Commonwealth v. Jeffries*, 95 S.W.3d 60 (Ky. 2002)(Johnstone, dissenting, noting that the exclusionary rule does not apply to sentencing).

interviewed Dillon after Jeffries' arrest, on March 7, 1995.  Doc.7-10 at 16-17, 30.

At the time of trial, the record reflects that Jeffries had the same information that prompted police to interview Dillon:  pretrial witness interview notes referring to an unidentified black male, knowledge of prior shared criminal history with John Dillon, and the report of Mike Miller that Dillon was seen 7/10 of a mile away from the murder scene at around 5:10 or 5:20 p.m.  The information that Jeffries did not possess was that Detective Babiarz had actually interviewed Dillon on March 7, 1995, and the contents of that interview.

Police initially went to Dillon's residence to speak to him but he was not home, so they left a message for him to call.  Dillon's grandmother subsequently brought him down to the police station for the interview.  Doc.7- 10 at 16.  No notes or tape from Dillon's interview were ever recovered; the state court referred to the presumed tape as having been "lost or destroyed" by the time of the motion for new trial.[18]   In the absence of any contemporaneous evidence, Detective Babiarz submitted an affidavit dated 6/25/98, more than three years after the interview, relating its contents to the best of his recollection.  Doc.7-9 at 39.  Babiarz recalled that Dillon had denied seeing Jeffries within a few weeks leading up to the murder, and denied having been in Mrs. McKee's neighborhood at the time of the murder.  At the evidentiary hearing (more than 4 years after the interview), Babiarz recalled that Dillon told him that he stated that he was visiting a girlfriend or "someone" at the end of Tenth Street in a top floor apartment.  Doc. 7-10 at 37.

---

[18]The Commonwealth argues that the record remains ambiguous as to whether any notes or a tape-recording was made.  However, the Commonwealth has failed to present clear and convincing evidence to contradict the state court's finding that a tape was made but subsequently lost. Dillon stated in his 1997 interview that he believed the 1995 interview had been taped.

At the evidentiary hearing, Babiarz could not recall asking Dillon for the name of the girlfriend or person he had been visiting on February 20, 1996. *Id* at 38. Babiarz did recall that Dillon's grandmother stated that she had been trying to keep Dillon away from Jeffries and out of trouble. Babiarz did not include Dillon on a list of suspects provided to the defense[19] because he did not consider Dillon to be a suspect prior to trial, and because a list of suspects disclosed to the defense (which included Jeffries) was compiled within days of the murder prior to Jeffries' arrest. Doc.7-10 at 30-31.

Thus, the information known to the Commonwealth but not disclosed to Jeffries prior to trial consisted of the following: 1) Babiarz interviewed Dillon on March 7, 1995 at the police station; 2) Babiarz did not consider him as a potential suspect on the basis of that interview; 3) Dillon stated during the interview that he had not seen Jeffries close in time to the murder, had not himself been in the neighborhood at the time, and offered an alibi for his whereabouts. The state courts held that this limited information known to the Commonwealth prior to trial and not disclosed to Jeffries was neither exculpatory nor favorable to Jeffries, nor inculpatory to Dillon. Therefore the court held that Jeffries had failed to satisfy even the first element of a *Brady* claim.

Jeffries argues that the interview could have been used for impeachment purposes, to the extent that it demonstrated that another suspect (Dillon) was dismissed by police without a thorough investigation, as contrasted with the investigatory focus on Jeffries. Jeffries contends that the interview of Dillon provided strong support for his "rush to judgment" theory. However, the trial transcript reflects that police never denied focusing their investigation on Jeffries, a fact

---

[19]The record reflects that the Commonwealth provided defendant with a shorter list of suspects as well as the list of 65 persons interviewed with "information" about "suspects."

defense counsel repeatedly and effectively emphasized throughout the course of trial. Jeffries was aware prior to trial of at least 11 more strongly identified "suspects" than Dillon who were never interviewed by police. Doc.37 at 8. Thus, proof that police failed to thoroughly investigate Dillon when they interviewed him after Jeffries' arrest had no significant impeachment value, but was cumulative at best to other evidence presented at trial.

In his initial motion for new trial, Jeffries also argued that exculpatory information was improperly suppressed because the prosecution was aware of Dillon's confessions *prior* to trial. Following the evidentiary hearing, the state courts unequivocally rejected that contention, finding that the state was aware and failed to disclose only the limited evidence that Dillon had been interviewed, because the state did not learn of evidence pertaining to "confessions" by Dillon until after Jeffries was convicted and sentenced. Jeffries has never contested that significant finding by the state court.

Finally, Jeffries argues that the Commonwealth's admission in state court proceedings that the "information should have been made available to [Jeffries] in pretrial discovery" amounts to a legal admission that the evidence was "favorable." Doc.37 at 10-11. I disagree. The legal determination that evidence is "favorable" under *Brady* is significantly different than the Commonwealth's concession that it failed to fully respond to a pretrial discovery request. The state courts accepted that distinction by finding that the evidence was not disclosed, but that neither was it "favorable" under the *Brady* standard. I find no error in the state court's legal determination that the information that was suppressed was not favorable to Jeffries.

### b.  Evidence Not Material or Prejudicial

Jeffries also attacks the state courts' conclusion that the Commonwealth's incomplete

discovery response was not material or prejudicial.  Jeffries asserts that without it, he had no

reason to investigate Dillon as a suspect.  Had he done so, Jeffries argues that he would have

been able to discover prior to trial all of the exculpatory information that pointed to Dillon (post-

trial) as the possible "real" perpetrator.  Specifically, Jeffries points to the discovery of

information that third party witnesses claimed to have heard Dillon confess to the crimes, and

evidence discrediting Dillon's alibi, all of which Jeffries argues undermine confidence in the

result of his trial.

       I find no legal error in the state court's characterization of the evidence as not material to

guilt or innocence under *Brady*.  The state court held that the information withheld was not

material because standing alone, that limited information "only possibly could have led to some

admissible evidence."  I agree with the state court that Jeffries' ability to discover exculpatory

evidence on the basis of the Commonwealth's incomplete discovery response is far too

speculative to show materiality and prejudice required under *Brady*.

       In affirming the state court's opinion, I note again that Jeffries had in his possession prior

to trial:  pretrial investigatory notes referring to an unidentified black male, knowledge of his

own shared criminal history with John Dillon, and the report of Mike Miller that Dillon was seen

7/10 of a mile away from the murder scene at around 5:10 or 5:20 p.m.  Babiarz's May 1999

testimony shows that his interest in Dillon was drawn by his prior association with Jeffries, who

was already in custody based on clear evidence linking him to the crime scene.  However, the

interview of Dillon was innocuous; it was not favorable to Jeffries in any way.  Knowing that

Dillon had stated in that interview that he was not in the vicinity of the murder and had not seen

the defendant seems an unlikely basis for investigating Dillon at all given the absence of *any*

other eyewitness, circumstantial, or forensic evidence linking Dillon to the crime.[20]  The

"unmatched" Caucasian hair, for example, could not have belonged to Dillon, an African-

American.  Even if Jeffries had investigated, it is highly improbable that such investigation

would have been so complete as to discover either: 1) alleged "admissions" to third parties in the

absence of any other evidence connecting Dillon to the crime; or 2)  flaws in Dillon's alibi.

The subsequent witness statements implicating Dillon arose spontaneously *after* trial, and

had absolutely no connection to the original interview of Dillon.  Nothing in the record suggests

that either the Commonwealth or Jeffries would have had any reason to speak to those third-

party witnesses, whose only relationship to this case appears to be alleged post-trial

"knowledge" of Dillon's involvement.  Jeffries offers no basis from which to speculate, much

less conclude, that he could have located or discovered the identity of *any* of these witnesses.

Jeffries argues that relief would be required  "[e]ven if the confession itself was not

discovered" because, at the very least, Jeffries would have discovered "Dillon's dishonesty about

his alibi" which in turn would have doomed the Commonwealth's theory that Jeffries "was the

only person who could have committed the offense."  Doc. 33 at 29-30.  However, even if

Jeffries had discovered any discrepancy in Dillon's alibi, he still had no evidence that Dillon was

closer than 7/10 of a mile away from the crime scene.  Many people, neighbors and visitors to

the neighborhood alike, were observed to be closer to the crime scene.  Dillon's proximity alone

hardly seems sufficient to make him a suspect, as contrasted to the evidence against Jeffries,

which included many witness accounts of his location within a half block, definitive forensic

---

[20]Jeffries offers no evidence of the extent of his investigation of the 65 other witnesses who were interviewed or of the 11 persons more clearly identified police as suspects.

54

evidence, and other circumstantial evidence of guilt.

A series of speculative assumptions are required even for a finding that Jeffries would have discovered flaws in Dillon's alibi in 1995.  Like the state court, I deem the likelihood of such a discovery to have been remote.

Jeffries first assumes that had he known the fact and contents of Dillon's 1995 interview, he would have independently investigated Dillon and discovered Peyton's name.  As recounted previously, Babiarz's testimony was that he did not ask for or note the name of Dillon's girlfriend in March of 1995.  Her name surfaced for the first time when Detective Pratt interviewed Dillon at his home on 12/3/97, 33 months after the murder and following post-trial discovery of witnesses who claimed to have knowledge of Dillon's "confessions."  In that interview, Dillon denied any such "confessions,"  reiterated his alibi, and offered to take a polygraph examination.  Pratt recorded that December 1997 interview and that tape was provided to Jeffries during the course of the proceedings on his motion for new trial.  Although the tape itself also failed to reveal the name of the girlfriend Dillon claimed to have been visiting on 2/20/95, Pratt testified that his recollection and notes reflected that Dillon identified the girl (for the first time) as Jessica Peyton.  Doc.7-11 at 12-13; Doc. 7-6 at 63.

Jeffries next assumes that Peyton would have been named by Dillon as his only corroborating witness, despite Miller's sighting of Dillon with a white male.  Miller's statement actually corroborates Dillon's 1995 statement in both time and place; Dillon might well have been with a male friend at 5:10 and a female one in the same vicinity (whether Peyton or

someone else) twenty or thirty minutes later.[21]

Finally, petitioner assumes that Peyton's testimony completely refutes Dillon's alibi. During the grand jury proceedings- which took place in May of 2000 more than five years after the murder - Jessica Peyton allegedly testified that she knew Dillon when she was 11 but had never been his girlfriend, and that she lived on 10th Street but did not move there until 1996 (after the murder). Descriptions of this grand jury testimony were first summarized by petitioner in his Final Brief in support of his state court motion for new trial. Doc. 2-13 at 13 (Jeffries' description, supported by citations to the tape-recorded testimony). Jeffries argued in state court that Peyton testified that she was not with Dillon on the date of the murder, Doc. 2-13 at 17 (Jeffries' description, not supported by citation).

During the state court proceedings, the Commonwealth argued that the tape of the Pratt interview, which was in evidence, contradicted Pratt's testimony at the evidentiary hearing that Dillon claimed to have visited Peyton on the day of the murder. Rather, on the tape Dillon identified Peyton as someone he was visiting months later, on one of the occasions he was allegedly overheard as "confessing" to the murder. Doc. 7-12 at 4. Detective Pratt's investigation focused on interviewing the witnesses to Dillon's alleged confessions. I find, based on my review of Pratt's contemporaneous notes, the Commonwealth's interpretation of Dillon's statement to be the more reasonable one. See 7-6 at 63. In other words, I find that Pratt's testimony at the May 1999 hearing (that Dillon identified Peyton as the person he visited

---

[21]The identity of the white male is also unclear. Although petitioner argues that it could not have been him, the only testimony in the record on the issue is from Detective Babiarz, who recollected that Mike Miller's father had been burglarized by Dillon and Jeffries the previous year and on that basis speculated that Miller "perhaps" would have recognized Jeffries if he had been with Dillon. Doc.7-10 (transcript of evidentiary hearing) at 20.

on the date of the murder) to be contradicted by his 1997 notes, which reflect that Dillon identified Peyton in reference to a different date, months after the murder.  Notably, neither the state trial court, which had the grand jury tapes before it as well as Pratt's notes, nor the Kentucky Court of Appeals, adopted Jeffries' factual allegations that Dillon claimed to have been with Peyton at the time of the murder, or that Peyton contradicted his testimony.  Thus I find no evidence at all that Peyton's testimony contradicted Dillon's alibi.  Even if petitioner's factual contention were adopted, considering that Dillon, a teenager, was not asked for the name of the girl he had visited until nearly 3 years later, a faulty recollection of her name (assuming that Peyton actually contradicts Dillon) does not clearly or even probably refute his entire alibi.

Petitioner has never placed Peyton's affidavit or direct testimony before this court.  Her post-trial grand jury testimony is among the few pieces of state court record not included in this federal record, as petitioner has never sought its inclusion herein.  His prior motion to expand the record and post-remand hearing concerning the same all focused solely on the inclusion of the trial transcript.  In the absence of an affidavit, a quotation, or the transcript or tape of the grand jury testimony, this court has no real basis on which it can determine whether Peyton, a junior in high school, was certain or equivocal concerning the exact date she moved to 10th Street, or the extent to which she discredited petitioner's alibi.  Pratt's testimony that Dillon claimed to have visited Peyton on the date of the murder is contradicted by his contemporaneous notes of his interview.  By contrast, the grand jury heard the testimony of Dillon and other witnesses besides Peyton and declined to indict.

The state court compared this case to *Wood v. Bartholomew, supra,* where the prosecution suppressed evidence of a polygraph examination of a key witness- the defendant's

57

brother -that suggested that the brother was lying when he denied his own involvement in the crime.  The Ninth Circuit concluded that the information was material and warranted habeas relief, because had it been disclosed, the defendant "might have led...counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized."  116 S. Ct. at 10.  However, because discovery of a confession by the brother would not have been inconsistent with the "overwhelming" evidence of the defendant's guilt, the Supreme Court held that it was not "reasonably likely" that disclosure of the evidence would have resulted in a different outcome at trial.

Based on my review of the trial transcript, I find no error in the state court's characterization of the evidence against Jeffries as "strong."  In comparison to the polygraph evidence known to prosecutors in *Wood,* the undisclosed interview in this case was far more innocent.  The state courts applied the correct legal standards and did not misconstrue Supreme Court law in denying petitioner's claim.  Like the state courts, I find no reasonable probability that had the fact and contents of the March 7, 1995 Dillon interview been disclosed, the result of the proceeding would have been different.

### c. Record Evidence Contrary to *Brady* Claim

Though not discussed by the state courts or considered above, this court would be remiss in failing to note evidence that at least suggests that Jeffries had independent knowledge of the accusations against Dillon *before* trial.  Such independent knowledge automatically would defeat petitioner's *Brady* claim, since *Brady* applies only to knowledge known to the state but unknown to the defense, not *vice versa*.   To the extent that *Brady* remains applicable, the evidence also could have been considered in determining materiality and prejudice.

58

As stated, there is no question that neither the prosecutor nor police had any knowledge of accusations against Dillon before trial.  By contrast, in his motion for a new trial Jeffries asserted that Linda Raisor (discovered by the Commonwealth post-trial) advised Detective Stephens that she had communicated information about Dillon's "confession" to the family of the defendant prior to trial and that the family had asked her to testify for the defendant.  Doc.2-4 at 9; Doc.7-7, at 35.

In addition, Detective Pratt's investigation notes dated 10/6/97 reflect that during a post-trial interview of Jeffries' mother, Alice Jeffries, she stated that *six months after the defendant's arrest but well before her son's trial* two women told her that a girl had information that Billy Jeffries did not murder Mrs. McKee, but that two other boys did so (Dillon and Ben Mills).  The girl's name was Joy Young.  The same notes reflect that Mrs. Jeffries stated that defense counsel located Joy Young prior to trial, but that her mother would not let them talk to Joy.  Finally, the notes reflect that defense counsel interviewed both of the two women prior to trial but nothing came of the information.  Doc. 2-4 at 32.  Nikki Chesser also told Mrs. McKee *after* trial that Dillon and Mills were the true perpetrators of the murder.  *Id*.

### D. **Non-Constitutional Claims/ Implied Innocence**

In his state court motion for new trial, Jeffries presented two distinct claims: the *Brady* claim that is cognizable for review by this court, and a second state law claim that is not.  Aside from holding that the "avenue of investigation" argument was too speculative to warrant relief under *Brady*, the state court carefully reviewed Jeffries' second non-constitutional claim that the post-trial exculpatory evidence *standing alone* was sufficient to grant him a new trial under Ky CR 10.02.  The trial court concluded that the state law claim, like the *Brady* claim, did not

59

warrant a new trial because the newly discovered evidence did not exculpate Jeffries.

Petitioner does not *expressly* assert the same error in this federal proceeding.  Contrary to state law, a claim of actual innocence based on newly discovered evidence does not provide grounds for federal habeas relief, because federal habeas courts "sit to ensure that individuals are not imprisoned in violation of the Constitution- not to correct errors of fact."  *Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 860 (1993).  Foreclosed from presenting the identical claim, petitioner instead implicitly folds it into his Constitutional *Brady* claim.  He argues that the state court should have given greater weight to the later-discovered evidence of Dillon's "guilt" to determine materiality and prejudice under *Brady*, as evidence that "undermines the confidence" of the verdict against him.  Alternatively, he implies (but again does not separately argue) that his innocence provides an added basis for relief under 28 U.S.C. §2254.

Neither argument persuades.  First, try as he might, Jeffries cannot base a federal claim for relief under §2254 upon an error of state law.  Second, Jeffries failed to fully develop his claim of innocence in state court.  Last but not least, Jeffries' proof of actual innocence falls far short of the standard required for habeas relief, even assuming that such a claim could be considered as a limited "gateway" to relief on Jeffries' primary Constitutional claims.

### 1.  Errors of State Law Not Grounds for Relief

The trial court's denial of Jeffries' motion for a new trial and the Kentucky Court of Appeals' opinion affirming that denial both rejected two claims - the *Brady* claim, and Jeffries' second non-constitutional claim based on Ky CR 10.02.  The state courts rejected the latter claim because Jeffries' proof failed to meet the requisite state law standard for relief, and because the evidence (at most) implicated Dillon as a possible accomplice.  In this proceeding, Jeffries

60

contends that the state courts erred in part by considering a possible "accomplice" theory because under Kentucky law, an accomplice theory would have required notice and an amendment to the indictment.

The Kentucky Court of Appeals' reference to the possible "accomplice" theory related not to Jeffries' *Brady* claim (rejected because the suppressed evidence was not favorable, material, or prejudicial under constitutional standards), but instead solely to his second state law claim under Ky CR 10.02 that the new evidence would have "with reasonable certainty" changed the verdict. Any error in the state courts' analysis of this second non-constitutional claim is fundamentally irrelevant because errors in state law by themselves do not provide grounds for federal habeas relief under the statute. 28 U.S.C. §2254; *see also Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005). Thus, whether the state courts erred in considering an accomplice theory or committed any other error of state law, those alleged errors afford Jeffries no relief in this proceeding absent proof of a Constitutional claim.

### 2. Failure to Develop State Court Record

The record reflects that Jeffries failed to fully develop his claim of innocence in state court. His failure to fully develop the factual basis for his claim in state court also precludes further development in this court.

Jeffries was provided every opportunity to explore the post-trial evidence of Dillon's alleged involvement in depth at the evidentiary hearing as well as through subsequent proceedings. Despite these opportunities, Jeffries failed to present credible evidence that Dillon was the "real" murderer and/or that Jeffries was innocent. Only three witnesses testified at the evidentiary hearing, all of them police detectives involved with the post-trial investigation of

Dillon: Rick Babiarz, Chuck Stephens, and Mike Pratt.  In addition to these three witnesses,

Jeffries submitted the affidavits of Chris Beach and Nikki Chesser, both of whom claimed to

have heard Dillon confess to the crime.

Jeffries could have tested some of the forensic evidence that apparently was collected but

never tested by the Commonwealth in an attempt to tie the evidence to some identifiable

perpetrator,[22] whether Dillon or someone else.  He did not.   Even after a full evidentiary hearing

on his motion for new trial in state court where petitioner was offered many opportunities to

present evidence concerning Dillon's alleged involvement and/or Jeffries' innocence, the trial

court denied the motion in part because "Mr. Dillon's denial and alibi were not impeached by

any *credible* source." Doc. 2-14 at 2 (emphasis added).

The trial court discredited the two affidavits based upon Dillon's denial during the

investigation and various inconsistencies of the statements made by Beach and Chesser. Neither

at the evidentiary hearing in May of 1999 nor in the years following that hearing did Jeffries

present additional witnesses or forensic evidence linking Dillon to the crime.  Jeffries instead

chose to rely solely on the discredited affidavits of Beach and Raisor and the unsworn notes of

investigators.  The trial court found nothing in the testimony to warrant a new trial, and strongly

criticized Jeffries' failure to present witnesses with firsthand knowledge of Dillon's involvement,

rather than merely the double- and sometimes triple-hearsay statements reflected in the

detectives' notes.[23]  In denying Jeffries' a new trial, the trial court noted that statements from two

---

[22]At trial, defense counsel repeatedly pointed out forensic evidence that was collected but never tested.

[23]Jeffries' choice not to present other witnesses, including Dillon, presumably was deliberate.  Although witness Raisor stated in her affidavit that Ms. Biggers had declared that her

of the witnesses who alleged Dillon's involvement did not support Jeffries' innocence but

implicated Jeffries as well.

> Defendant contends that perhaps other people (of whom the Defendant had
> knowledge but did not produce any information from them pursuant to the new
> trial motion and proceedings) might have some knowledge regarding this case.
> Speculation about what somebody might know does not give rise to a reasonable
> certainty that the verdict would have been different.

Doc. 2-14 at 3.  The Kentucky Court of Appeals likewise noted Jeffries' failure to "present

witnesses at the hearing" and that the defendant's various "allegations and theories...which did

not hold up" at the hearing.  Doc. 2-15 at 3, 8.

The trial court provided Jeffries with multiple post-hearing opportunities to supplement

the record, including referring the matter to a grand jury and providing Jeffries with access to

tapes and/or transcripts of those proceedings.   The motion for new trial was filed on June 9,

1998 but due in part to delays at Jeffries' request, the trial court did not rule on the motion until

more than three years later on August 29, 2001.  During the course of these extensive state court

proceedings and up until this day, Jeffries has never uncovered any eyewitness or forensic

evidence that links Dillon to the crime;[24] the discredited affidavits and hearsay statements of

Dillon's alleged "confessions" remain the primary evidence on which Jeffries relies to support

his claims.   As noted by petitioner himself in state court, to afford Jeffries relief under Ky CR

10.02 on the basis of such post-trial hearsay alone, the state court would have had to overrule or

---

"nephew" Dillon had admitted the crime, when interviewed, Biggers flatly denied every portion
of that alleged statement, and stated that Dillon is not her nephew in any event.  Raisor, on the
other hand, is related to Jeffries.  Two witnesses implicated both Jeffries and Dillon, providing a
significant reason not to call Dillon himself.

[24]Jeffries' argument that the unidentified Caucasian head hair could have come from the
unidentified white male who was seen with Dillon no more implicates Dillon than Jeffries.

63

distinguish settled state law, *see Yates v. Commonwealth*, 375 S.W.2d 271 (1964)(new trial is not

warranted based upon the confession of a third person where that confession was hearsay).  Doc.

2-4 at 4 (motion for new trial).

### 3.  Inadequate Proof of Actual Innocence

Although Jeffries makes no separate "actual innocence" claim in this proceeding, he

suggests that the possibility of innocence provides the foundation for the "miscarriage of justice"

argument that underlies both his sufficiency and *Brady* claims.  A free-standing claim of actual

innocence by itself is generally *not* grounds for relief under 28 U.S.C. §2254.  *See Herrera v.*

*Collins*, 506 U.S. 390, 113 S.Ct. 853 (1993); *D'Ambrosio v. Bagley*, 527 F.3d 489, 498 n.6 (6th

Cir. 2008)(free-standing claims of actual innocence do not provide grounds for relief in this

circuit).  In capital cases, a habeas petitioner may incorporate a claim of actual innocence in

order to excuse an otherwise-barred underlying claim of constitutional error.  *See Schlup v. Delo*,

513 U.S. 298, 315, 114 S.Ct. 851, 865 (1995)(superseded in part by statute).  However, it is far

less clear that an actual innocence claim may be used as a "gateway" for review of otherwise-

barred Constitutional claims in non-capital cases.[25]   Even assuming such a claim exists in this

case, Jeffries' proof fails to meet the *Schlup* standard for relief.

"[A] substantial claim that constitutional error has caused the conviction of an innocent

person is extremely rare...To be credible, such a claim requires petitioner to support his

allegations of constitutional error with new reliable evidence - whether it be exculpatory

scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not

---

[25]Other circuits have split on the issue and neither the Supreme Court nor the Sixth
Circuit have yet decided whether an actual innocence claim can be presented in non-capital
cases.  *Ross v. Berghuis*, 417 F.3d 552, 557 (6th Cir. 2005).

presented at trial." *Schlup v. Delo*, 513 U.S. at 324, 114 S.Ct. at 865.  The habeas petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Id.*, at 327, 114 S.Ct. at 867.  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence" which requires "a stronger showing than that needed to establish prejudice." *Id.*  This standard differs from the standard which governs insufficient evidence claims by requiring this court to assess how reasonable jurors would react to the overall, newly supplemented record.  *House v. Bell*, 547 U.S. 518, 126 S.Ct. 2064 (2006).

While petitioner's claims may introduce some small degree of uncertainty in the verdict, his evidence falls well short of the legal standard required for habeas corpus relief.   The jury was presented with strong circumstantial and forensic evidence of petitioner's guilt and was entitled to disbelieve Jeffries' contradictory and incredulous testimony.  Petitioner has failed to offer any forensic or other <u>reliable</u> evidence to this day ("trustworthy eyewitness accounts" or "critical physical evidence") that can be traced to any other *identifiable* perpetrator including Dillon.  *See Keith v. Bobby*, 551 F.3d 555 (6th Cir. 2009)(rejecting habeas claim in capital case where, at most, new evidence introduced doubt); *compare generally Apanovitch v. Houk,* 466 F.3d 460 (rejecting *Brady* violation involving alleged suppression of possible other suspects where forensic evidence did not match defendant).

### III. Conclusion and Recommendation

For the reasons stated herein, **IT IS RECOMMENDED THAT** the petitioner's petition for writ of habeas corpus [Doc.#1], as fully considered on remand to this court, be **DENIED**, and that this case be dismissed and stricken from the active docket.

Particularized objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service or further appeal is waived. *U.S. v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005); *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd*, 474 U.S. 140, 155 (1985). A general objection that does not "specify the issues of contention" is not sufficient to satisfy the requirement of a written and specific objection. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995)(citing *Howard v. Secretary of HHS*, 932 F.2d 505, 508-09 (6th Cir. 1991)). Poorly drafted objections, general objections, or objections that require a judge's interpretation should be afforded no effect and are insufficient to preserve the right of appeal. *Howard*, 932 F.2d at 509. A party may respond to another party's objections within ten days of being served with a copy of those objections. Fed. R. Civ. P. 72(b)(2).

This 24th day of March, 2009.



Signed By:

**J. Gregory Wehrman**

**United States Magistrate Judge**